In the Matter of the Proposed Activation of the MINNESOTA JOINT UNDERWRITING ASSOCIATION and the Market Assistance Plan to Insure Specified Classes of Business.

No. C5–86–1819.

Court of Appeals of Minnesota.

June 23, 1987.

---

600

A. James Dickinson, Stringer, Courtney & Rohleder, St. Paul, for respondent Asbestos Abatement Contractor Class.

Douglas M. Stevens, Burnsville, for respondent Waterslides Class.

James B. Loken, James D. O'Connor, Faegre & Benson, Minneapolis, for petitioners Ins. Federation of Minnesota, et al.

Hubert H. Humphrey III, Atty. Gen., John C. Bjork, Sp. Asst. Atty. Gen., St. Paul, for respondent Com'r of Commerce.

Byron E. Starns, Leonard, Street & Deinard, Minneapolis, for respondent MN

Chapter of the Solid Wastes Management Assn., et al.

Gregory T. Halbert, Larkin, Hoffman, Daly & Lindgren, Ltd., Bloomington, for respondent Dakhue Landfill, Inc. and Sylvester Bros. Dev. Co.

Heard, considered, and decided by RANDALL, P.J., and WOZNIAK and NIERENGARTEN, JJ.

## OPINION

WOZNIAK, Judge.

Petitioners, the Insurance Federation of Minnesota, the American Insurance Association, the Alliance of American Insurers, and the National Association of Independent Insurers, appeal the Commissioner of Commerce's order extending activation of the market assistance plan (MAP) and the joint underwriting association (JUA) to the following classes of business: riding stables, waterslides, and landfills. We affirm.

## FACTS

In 1986 the Minnesota legislature enacted the Minnesota Joint Underwriting Association Act, now codified at Minn.Stat. § 62I.01–.22 (1986). The Act is both ambiguous in substance and complex in structure. The Act's stated purpose in its first sentence is:

> to provide insurance coverage to any person or entity unable to obtain insurance through ordinary methods if the insurance is required by statute, ordinance, or otherwise required by law, or is necessary to earn a livelihood or conduct a business and serves a public purpose.

*Id.* § 62I.02, subd. 1.

The Act creates two separate entities, a market assistance plan (MAP) and the joint underwriting association (JUA), both of which play significant, independent roles in helping Minnesota businesses obtain necessary insurance coverage. Initially, before the JUA may issue insurance, the Commissioner of Commerce must, by notice, activate the JUA and the MAP for certain classes of businesses. The Commissioner must activate the JUA and the MAP when

he "deems it necessary to provide assistance with respect to the placement of general liability insurance coverage on Minnesota risks for a class of business." *Id.* § 62I.21. The MAP and the JUA are activated for 180 days, after which a hearing must be held to determine whether activation is necessary beyond the initial 180–day period. Extended activation is necessary to fulfill the purposes of the Act when MAP has not yet located coverage and/or the JUA has not yet issued a policy for businesses affected by the initial activation.

When a particular class of business has been activated, a member of that class may apply for insurance by filing an application simultaneously with both the JUA and the MAP. The MAP is operated by the market assistance program committee, the majority of the members of which are insurance industry representatives. The MAP first identifies private insurers' and surplus lines licensees' will to participate in MAP. Upon receipt of an application, the MAP committee will assist the applicant in obtaining insurance, primarily by sending applications to participating insurers for quotations based upon the participating insurers' independent underwriting determinations. If MAP cannot obtain a quote from its participating insurers, it may take additional efforts to place coverage in the private market through canvassing carriers and negotiating for shared coverage with multiple carriers. All applications to the JUA for insurance policies must be reviewed by MAP before the JUA may consider coverage. If an applicant receives an acceptable quote from an insurer through MAP, either before or after the JUA issues coverage, "the applicant will be deemed to not be qualified to participate in the association and coverage, if any, shall be terminated." *Id.* § 62I.10, subd. 9. Therefore, to the extent that MAP is successful in its efforts to place coverage with private carriers, the JUA need never issue a policy.

Thus, the design of the Act is that MAP serves as the first level of assistance to Minnesota businesses which are unable to obtain insurance coverage in the private market. The commissioner's activation de-

cision then is the key to unlocking the market assistance process. If the Act is not activated for a particular class of business, members of that business class are not only denied the issuance of insurance policies from JUA, but, more importantly, they are denied access to MAP, which assists insurance consumers in locating private carriers willing to provide coverage.

The JUA is run by a board of directors, a majority of whom are appointed by the Commissioner of Commerce. It is administered by "a qualified insurer or vendor of risk management services selected by the commissioner." *Id.* § 62I.12, subd. 1. The JUA is authorized, with respect to eligible applicants, to:

(1) issue or cause to be issued insurance policies to applicants subject to limits specified in the plan of operation; (2) underwrite the insurance and adjust and pay losses with respect to it, or appoint service companies to perform those functions; (3) assume reinsurance from its members; and (4) cede reinsurance.

*Id.* § 62I.04. The Act further provides:

Because the activities of certain persons or entities present a risk that is so great, *the association shall not offer* insurance coverage to any person or entity *the board of directors of the association* determines is outside the intended scope and purpose of the association because of the gravity of the risk of offering insurance coverage. *The association shall not offer* environmental impairment liability or product liability insurance. *The association shall not offer coverage* for activities that are conducted substantially outside the state of Minnesota unless the insurance is required by statute, ordinance, or otherwise required by law.

*Id.* § 62I.02, subd. 1 (emphasis added). According to the definitional section, association refers to the JUA, while commissioner means the Commissioner of Commerce. *Id.* § 62I.03, subds. 2, 3.

The JUA must set rates and operate as a whole on an actuarily-sound basis.

Every insurer authorized to write property and casualty insurance in Minnesota must be a member of the JUA as a condition of obtaining and retaining a license to write insurance in this state. If the JUA sustains losses/expenses in excess of the charges collected, each member of the association is assessed an amount of such losses equal to the proportion the member's annual direct written premiums bear to the total annual aggregate direct written premiums written in Minnesota by all members.

This proceeding was initiated in 1986, when the Commissioner published notices of activation of the MAP and the JUA for 21 different classes of businesses. The hearing regarding activation extension of the following classes was held in August 1986: riding stables, waterslides, electrical inspectors, asbestos abatement contractors, environmental contractors, landfills, grain buyers, public grain warehouse operators, and businesses engaged in the research and development and manufacture of components and products in the electronics or information technology industries (known as high tech). Petitioners' motion to intervene in the proceeding was granted.

Representatives from six landfills sought continued activation of the JUA and the MAP. For all but one landfill, present county ordinances require a certificate of insurance for a landfill to operate. In some instances, a letter of credit was a possible alternative. All the landfills were unsuccessful in their attempts to find coverage. The MAP has been unable to secure coverage for one landfill and others remain uninsured. An economist for the Minnesota Pollution Control Agency testified that lack of insurance may hamper proper post-closure activities and may force premature closure of landfills, shifting costs, and increased waste to unprepared facilities.

Representatives of three riding stables testified in favor of continued activation. Only one of the riding stables was able to obtain a quote for an annual premium of $10,000; the others were unable to obtain insurance. All three stables had been informed that the MAP was unable to locate coverage for them and two stables were presently insured through the JUA. The

representatives testified that insurance was necessary to conduct their businesses, either because the lessor of land leased by the stable requires insurance or customers will not do business with them without insurance. Nevertheless, several other stables do operate without insurance.

One representative from the class of waterslides attended the hearing. He testified that the waterslide was unable to find adequate insurance, receiving only one quote for a $16,000 premium from a Bermuda captive company not licensed in Minnesota. It would have been necessary to wire the entire premium to Bermuda before the company would have identified the type of policy to be issued. The facility did not exercise this option in favor of pursuing coverage from the JUA. The waterslide is required by a contract for deed to maintain insurance.

Representatives of the asbestos abatement contractors and the high tech class also testified to the unavailability and necessity of insurance. Members of the classes of electrical inspectors, environmental contractors, grain buyers, and public grain warehouse operators did not appear at the hearing.

Underwriters from several insurance agencies testified for petitioners and offered evidence as to the availability of insurance through excess and surplus lines for all classes present at the hearing. In addition, several witnesses testified as to the uncertainty of excluding environmental impairment liability (EIL) coverage from comprehensive general liability (CGL) insurance.

In September 1986, the ALJ made findings and concluded that neither the "high tech" class nor the asbestos abatement contractors had sustained their burden of proof. He recommended continued activation of the MAP and the JUA for riding stables, waterslides, and landfills. The Commissioner accepted the ALJ's recommendations in their entirety.

## ISSUES

1. Did the Commissioner err in adopting a standard for extended activation of the MAP and the JUA?

2. Is the Commissioner's decision to extend activation to the classes of landfills, waterslides, and riding stables supported by substantial evidence and within his statutory authority?

## ANALYSIS

A hearing to extend activation of the MAP and the JUA is a contested case under Minn.Stat. § 62I.22 (1986). Judicial review of a contested case is governed by Minn.Stat. § 14.69:

In a judicial review under sections 14.-63 to 14.68, the court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

*Id.*

Agency decisions enjoy a presumption of correctness. *Crookston Cattle Co. v. Minnesota Department of Natural Resources,* 300 N.W.2d 769, 777 (Minn.1980). Courts should show deference to the agency's expertise and special knowledge in the field of its training, education, and experience. *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977). "Where the evidence is conflicting or more than one inference may be drawn from the evidence, the findings of the hearing examiner must be upheld." *State ex rel. Gomez-Bethke v. Office of County Auditor,* 347 N.W.2d 541, 542 (Minn.Ct.App.1984); *see also City of Minneapolis v. Richardson,* 307 Minn. 80, 88, 239 N.W.2d 197, 202 (1976). The court

should defer to the agency's skill and expertise even in cases of first impression. *See Minnesota Life and Health Insurance Guaranty Association v. Department of Commerce*, 400 N.W.2d 769, 773 (Minn.Ct. App.1987).

■ In reviewing an agency's factual findings, courts should use the substantial evidence test. *In re Kern Grain Co.*, 369 N.W.2d 565, 569 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. Aug. 29, 1985). Substantial evidence is defined as:

1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;

2) more than a scintilla of evidence;

3) more than 'some evidence';

4) more than 'any evidence'; and

5) evidence considered in its entirety.

*Reserve Mining Co.*, 256 N.W.2d at 825. The petitioner has the burden of establishing that the agency's findings are not supported by the record in its entirety. *Id.*

■ In addition, agency findings may be rejected if they are arbitrary and capricious. *Peoples Natural Gas Co. v. Minnesota Public Utilities Commission*, 342 N.W.2d 348, 351 (Minn.Ct.App.1983). An agency determination is arbitrary and capricious if it represents the agency's will and not its judgment. *Markwardt v. State, Water Resources Board*, 254 N.W.2d 371, 374 (Minn.1977).

■ When agency conclusions are based on legal rather than factual considerations, however, the reviewing court is not bound by the agency's decision and need not defer to the agency's expertise. *Frost-Benco Electric Association v. Minnesota Public Utilities Commission*, 358 N.W.2d 639, 642 (Minn.1984). An agency's interpretation of legislative intent, while influential, cannot bind a court. *Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Authority*, 464 U.S. 89, 98 n. 8, 104 S.Ct. 439, 444 n. 8, 78 L.Ed.2d 195 (1983). When a statute is unambiguous, its wording controls over agency interpretations. *Kern Grain Co.*, 369 N.W.2d at 570. Nonetheless, "[w]hen the meaning of a statute is doubtful, courts should give great weight to a construction placed upon it by the department charged with its administration." *Krumm v. R.A. Nadeau Co.*, 276 N.W.2d 641, 644 (Minn. 1979); *see also Goodman v. State, Department of Public Safety*, 282 N.W.2d 559, 560 (Minn.1979) (substantial consideration accorded to administrator's statutory interpretation).

1. The Commissioner concluded that, for continued activation of the MAP and the JUA, class members must satisfy a two-part test drawn from the first sentence of section 62I.02, subd. 1[1]: (1) Applicant is unable to obtain insurance through ordinary means, and (2) insurance sought is either (a) required by statute, ordinance, or other law, or (b) necessary to earn a liveli-

## 1. 62I.02 MINNESOTA JOINT UNDERWRITING ASSOCIATION.

Subdivision 1. **Creation.** The Minnesota joint underwriting association is created to provide insurance coverage to any person or entity unable to obtain insurance through ordinary methods if the insurance is required by statute, ordinance, or otherwise required by law, or is necessary to earn a livelihood or conduct a business and serves a public purpose. Prudent business practice or mere desire to have insurance coverage is not a sufficient standard for the association to offer insurance coverage to a person or entity. The association shall be specifically authorized to provide insurance coverage to day care providers, foster parents, foster homes, developmental achievement centers, group homes, and sheltered workshops for mentally, emotionally, or physically handicapped persons, and citizen participation groups established pursuant to the housing and community

redevelopment act of 1974, Public Law Number 93–383. Because the activities of certain persons or entities present a risk that is so great, the association shall not offer insurance coverage to any person or entity the board of directors of the association determines is outside the intended scope and purpose of the association because of the gravity of the risk of offering insurance coverage. The association shall not offer environmental impairment liability or product liability insurance. The association shall not offer coverage for activities that are conducted substantially outside the state of Minnesota unless the insurance is required by statute, ordinance, or otherwise required by law. Every insurer authorized to write property and casualty insurance in this state shall be a member of the association as a condition to obtaining and retaining a license to write insurance in this state.

hood or conduct a business and serves a public purpose. Minn.Stat. § 62I.02, subd. 1 (1986). The Commissioner held that the questions of:

> (1) whether the activities of certain persons or entities present a risk so great that they should not be offered insurance coverage; (2) whether coverage requested is for environmental impairment liability or product liability insurance, or (3) whether the activities to be covered are conducted substantially outside of the state of Minnesota * * * are questions within the jurisdiction of the Minnesota Joint Underwriting Association rather than the Commissioner of Commerce in this contested case proceeding.

■ Petitioners argue that class members should be required to prove *all* elements of subdivision 1 for extended activation. Petitioners contend that the Commissioner must consider every requirement of subdivision 1 to carry out his duty to enforce all insurance laws of the state, regardless of whether the JUA also must consider those requirements. Finally, petitioners claim that initial activation by the Commissioner for 180 days will meet the needs of applicants for informal assistance from the MAP and for insurance from the JUA.

The standards for initial and extended activation of the JUA and the MAP are far from clear. As heretofore indicated, the Act is both ambiguous in substance and complex in structure. While not a model of clarity, it is possible to draw from the language of the statute the legislature's intent. Section 62I.21 requires activation when the Commissioner deems it necessary. *Id.* § 62I.21. The section does not, however, indicate a specific standard for extended activation.

> When the words of a law are not explicit, the intention of the legislature may be ascertained by considering, among other matters:
>
> (1) The occasion and necessity for the law;
>
> * * * * * *
>
> (3) The mischief to be remedied;

> (4) The object to be attained;
>
> * * * * * *
>
> (6) The consequences of a particular interpretation;
>
> * * * * * *
>
> (8) Legislative and administrative interpretations of the statute.

Minn.Stat. § 645.16. In determining legislative intent, the court looks first to the statutory language itself. While the first sentence of section 62I.02, subd. 1 reflects the purpose of the statute, the remaining sentences speak in terms of requirements and duties of the *association* and *the board of directors of the association.* According to the definitional section, association refers to the JUA, while commissioner means the Commissioner of Commerce. This language indicates that application of the later criteria of section 62I.02, subd. 1, should be left to the JUA.

In addition, language similar to that of the continued activation standard adopted by the Commissioner—"any person or entity unable to obtain insurance"—can be found throughout the statute. *See id.* § 62I.04 ("refusal to insure"), .08 ("denied coverage or is unable to [obtain]," "unable to find anyone to offer the coverage"), .13, subd. 2 ("unable to obtain insurance"). The repeated use of similar terms throughout the statute further indicates that the legislature intended extended activation to be based primarily on inability to obtain insurance. Moreover, giving the Commissioner the authority to consider issues of gravity of risk, location of businesses, and type of liability coverage sought would usurp the JUA's underwriting function and render it ineffective.

Since the Minnesota Joint Underwriting Association Act is remedial in nature, it "must be *liberally construed* for the purpose of accomplishing [its object]." *State v. Industrial Tool & Die Works, Inc.,* 220 Minn. 591, 604, 21 N.W.2d 31, 38 (1945) (emphasis added). Although petitioners justifiably express their concern over increased costs and possible losses to insurers, the public interest in providing insurance to persons or entities who need it is overriding. Therefore, because the statute

is ambiguous as to the standard for extended activation and because nothing in the statute is incompatible with the Commissioner's interpretation, the court will defer to the Commissioner's conclusion that only the first sentence of section 62I.02, subd. 1 should provide the standard for extended activation, i.e.,

> to provide insurance coverage to any person or entity unable to obtain insurance through ordinary methods if the insurance is required by statute, ordinance, or otherwise required by law, or is necessary to earn a livelihood or conduct a business and serves a public purpose.

Minn.Stat. § 62I.02, subd. 1.

2. The Commissioner concluded that the classes of landfills, riding stables, and waterslides fulfilled the requirements for extended activation. Petitioners contend that insufficient evidence supports the Commissioner's findings and that the Commissioner's interpretation of statutory terms is beyond the scope of his authority.

 a. *Landfills.* The Commissioner held that insurance was required by law for the class of landfills despite the availability in some cases of alternatives such as a letter of credit or a variance. Petitioners argue that the existence of these alternatives for landfills precludes a finding that they are required by law to have insurance. Overwhelming evidence indicates that most counties require landfills to maintain insurance. In the alternative, the landfill class offered evidence that insurance serves a public purpose. In either case, the Commissioner's conclusion that landfills meet the requirements for extended activation is supported by substantial evidence.

 The Minnesota Joint Underwriting Association Act provides that "[t]he association shall not offer environmental impairment liability [EIL] or product liability insurance." Minn.Stat. § 62I.02, subd. 1 (1986). While no representative of the landfill class requested EIL coverage from the JUA, several of petitioners' witnesses testified that EIL coverage is inherent in the completed operations and product hazard coverage of CGL insurance including that offered by the JUA. This occurs de-spite the standard pollution exclusion in CGL policies. Petitioners contend that, as a matter of law, the landfill class may not be activated if the possibility of inherent EIL coverage exists.

According to the Minnesota Joint Underwriting Act, the JUA, *as a matter of law,* cannot issue EIL coverage. Moreover, the legislature has determined that the JUA has the power to write an effective pollution exclusion. Section 62I.06, subdivision 1 permits the JUA to adopt policy forms consistent with its needs and the practice in the private market. *Id.* § 62I.06, subd. 1. Because the legislature gave the JUA the power to adopt and issue policies and endorsements and because the possibility of inherent EIL coverage in CGL insurance is merely speculative, this court will give effect to the law and the JUA's insurance policies and endorsements excluding EIL coverage. Therefore, the Commissioner did not err as a matter of law in extending activation of the JUA and the MAP to landfills.

 b. *Riding Stables.* In his finding that the riding stables met the requirements for extended activation, the Commissioner concluded "that where coverage is offered at a prohibitive premium, this does not mean that liability insurance was obtainable within the meaning of the statute." Petitioners argue that the Act only authorizes the JUA to issue insurance where it is *unavailable,* not unaffordable. Petitioners contend that permitting the Commissioner to extend activation in this manner will destroy the possibility that the JUA can operate in an actuarily-sound basis. Petitioners further claim that, since one riding stable received a quote for a $10,000 premium, the facility was not "unable to obtain insurance" within the meaning of the Act and consequently the JUA and the MAP should have been deactivated with respect to riding stables.

Evidence shows that the majority of riding stables were unable to obtain insurance. To give effect to the purposes of the Act, a class must be considered "unable to obtain insurance" when the price of insur-

ance is so prohibitive as to effectively prevent a class member from obtaining coverage. In addition, the insurer which quoted the premium of $10,000 to one riding stable later maintained to another stable that it no longer offered insurance for riding stables. Consequently, substantial evidence supports the Commissioner's decision to continue activation for the class of riding stables.

■ c. *Waterslides.* The Commissioner extended activation of the JUA and the MAP to waterslides when only one representative was present at the hearing. Petitioners claim that for extended activation, the representatives must show that activation is necessary for the entire class; otherwise, continued activation is unnecessary.

Repeatedly throughout the statute, the words "any person or entity" are used. *See* Minn.Stat. §§ 62I.02, subd. 1, .04, .08, .13, subd. 2 ("anyone") (1986). This manifests an intent by the legislature to permit one class member to institute extended activation for the entire class. In addition, during the activation of the temporary joint underwriting association for medical malpractice insurance, *id.* §§ 62F.01–.14, a statute similar to the present Act, the ALJ concluded that the intent of the legislature was that, if one health care provider was unable to obtain insurance, the JUA could be activated for the entire group. Therefore, the Commissioner's extended activation of the waterslide class was not in excess of his authority, or arbitrary and capricious.

■ The Commissioner also concluded that the "ordinary methods" to obtain insurance required under Minn.Stat. § 62I.02, subd. 1, did not include seeking insurance from an insurer not regulated by Minnesota insurance law or from an excess and surplus lines broker. Petitioners claim that for unusual or difficult risks such as riding stables, waterslides, and landfills, the excess and surplus market is the normal and necessary method by which insurance is obtained. Because in most cases the class members did not contact these markets, petitioners argue that class members failed to use "ordinary methods."

Considering first the language of the statute, the plain meaning of the term ordinary makes it unlikely that excess and surplus markets would be termed ordinary. In fact, the Act speaks in terms of *ability*, not availability. If despite ordinary efforts, representatives are unable to obtain insurance, they meet the Act's standard. Furthermore, the court will construe the Act to give effect to all its provisions, particularly §§ 62I.09–10, pertaining to the MAP. If applications were required to use extraordinary methods to obtain insurance, e.g., excess and surplus lines, before activation could occur, the MAP would be rendered meaningless. Therefore, the Commissioner did not err in his interpretation of the term "ordinary methods" and his conclusion that landfills, waterslides, and riding stables meet the standard is supported by substantial evidence.

d. *High Tech Class.* In his initial activation notice in July 1986, the Commissioner activated the class of "businesses engaged in the research and development and manufacture of components and products in the electronics or information technology industries." The Commissioner concluded that the class did not meet the standards for continued activation. In response to petitioners' challenge to the class designation, the Commissioner stated: "It does not appear that that discretionary decision is meant to be a subject of challenge in this contested case proceeding."

Petitioners argue that the "high tech" class designation is tremendously broad and bears no relationship to a recognized business class. Petitioners claim that a presumption arises that an agency's exercise of discretion is reviewable and nothing in the Act precludes it.

■ "Any person aggrieved by a final decision in a contested case is entitled to judicial review * * *." Minn.Stat. § 14.63 (1986). A person is aggrieved if

injuriously or adversely affected by the judgment or decree when it operates on his rights of property or bears directly upon his personal interest. The word "aggrieved" refers to a substantial griev-

ance, a denial of some personal or property right, or the imposition on a party of a burden or obligation.

*In re State Farm Mutual Automobile Insurance Co.,* 392 N.W.2d 558, 564 (Minn.Ct. App.1986) (quoting *In re Getsug,* 290 Minn. 110, 114, 186 N.W.2d 686, 689 (1971)). To be entitled to appeal, the right invaded must be " 'immediate, not merely some possible, remote consequence, or mere possibility arising from some unknown and future contingency * * *.' " *Twin Cities Metropolitan Public Transit Area v. Holter,* 311 Minn. 423, 425–26, 249 N.W.2d 458, 460 (1977) (quoting *In re Trust in Estate of Everett,* 263 Minn. 398, 401, 116 N.W.2d 601, 601 (1962)). Whether or not the "high tech" class designation was too broad, petitioners are not aggrieved because the Commissioner deactivated the "high tech" class and the class did not appeal. Therefore, petitioners cannot raise the issue on that basis.

■ Petitioners, however, claim that the reviewability of class designations is relevant to the classes which were granted continued activation. Petitioners did not raise this issue as to the classes of waterslides and riding stables at the activation hearing. Petitioners made no showing that the classes are too broad or that petitioners are harmed by the designation. Courts may not issue advisory opinions nor rule on abstract propositions. *See Renzaglia v. Chipman,* 298 Minn. 384, 385, 215 N.W.2d 477, 478 (1974). Consequently, petitioners may not challenge the designations of the waterslide and riding stable classes.

Furthermore, petitioners mischaracterize the issue. The Commissioner did not state that class designations are unreviewable, but that they are not "meant to be a subject of challenge in this contested case proceeding." Section 62I.21 gives the Commissioner the discretion to designate a class for activation purposes. The purpose of the hearing under section 62I.22 is to determine "whether activation of the [MAP] and the [JUA] is necessary beyond the 180–day period." Minn.Stat. § 62I.21. The Commissioner, upon reviewing the ALJ's findings and conclusions, has author-

ity to redefine a class in his final decision. *See Proposed Activation of the Minnesota Joint Underwriting Association and the Market Assistance Plan to Insure Specific Classes of Businesses (JUA–III),* slip op. at 4 (Commissioner of Commerce Jan. 23, 1987). If, in fact, a party is aggrieved by a broad class designation, the party is entitled to an appeal from the Commissioner's final order. *See* Minn.Stat. § 14.63. Consequently, though class designations are reviewable, petitioners are not an aggrieved party and have no standing to raise the issue in this appeal.

### DECISION

The Commissioner's decision to extend activation of the MAP and the JUA to the classes of landfills, riding stables, and waterslides is supported by substantial evidence and is within his statutory authority.

Affirmed.