In the Matter of the Contested Cases of ST. OTTO'S HOME, LITTLE FALLS, MINNESOTA, and St. Francis Home, Breckenridge, Minnesota, Relators,

v.

DEPARTMENT OF HUMAN SERVICES, Respondent.

No. C7-87-2514.

Court of Appeals of Minnesota.

May 31, 1988.

Review Granted Aug. 4, 1988.

Samuel D. Orbovich, Broeker, Geer, Fletcher & Lafond Ltd., Bloomington, for relators.

Hubert H. Humphrey, III, Atty. Gen., John L. Kirwin, Julie K. Harris, Sp. Asst. Attys. Gen., St. Paul, for respondent.

Heard, considered and decided by CRIPPEN, P.J., and SCHULTZ and FLEMING, JJ.[*]

## OPINION

CRIPPEN, Judge.

Relators, St. Otto's and St. Francis nursing homes, appeal by writ of certiorari from a contested case decision of the Commissioner of Human Services that the homes are not "hospital-attached nursing homes" for purposes of rate setting under Minn.R. 9549.0020 subp. 26 (1985).

## FACTS

The Franciscan Sisters of Little Falls is an order of nuns that provides health and related services to the Minnesota elderly and infirm through their hospitals, nursing homes, and related facilities. The Sisters formed a nonprofit corporation named Franciscan Sisters Health Care, Inc., which owns and operates relators St. Otto's Home and St. Francis Home.

The Department of Human Services has developed a system for determining the payment rate for reimbursing all nursing

---

[*] Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

homes which provide care for the needy and participate in the medical assistance program. *See* Minn.R. 9549.0010, 9510.-0020 (1985). The total payment rate is a composite of three rates, one being the operating cost payment rate. Minn.R. 9549.0020 subp. 44 (1985). The operating cost rates differ between nursing homes that are free-standing and those that are "hospital-attached nursing homes." The difference is explained by the fact that hospital-attached nursing homes tend to absorb part of the cost of running the hospital and so the nursing home itself has higher operating costs and is entitled to a higher operating cost rate. In contrast, a free-standing nursing home does not absorb the costs of a hospital and is not entitled to the higher rate.

Prior to the November 1, 1985 rate year, relators had been reimbursed for care at the higher rate for hospital-attached nursing homes. For the rate year beginning November 1, 1985, relators did not receive hospital-attached classification and have been reimbursed for care at a lower daily rate. Relators were denied hospital-attached status because the Commissioner found they and the nearby hospitals were not commonly owned, commonly operated, or required to use the "stepdown method of allocation" under Minn.R. 9549.0020, subp. 26.

### A. St. Otto's operation

St. Otto's Home and St. Gabriel's Hospital in Little Falls are attached by a tunnel used by patients, residents and staffs of the facilities. The hospital and home are part of the St. Francis Campus, a complex of 20 buildings owned and operated by a corporate arm of the Franciscan Sisters. Through Campus Services, an informal board of several unit managers, the home and hospital share a power plant, laundry, maintenance services, biomedical engineering, administrative services, security services, management services, and trucking services. The home and hospital also share the same telephone services and a WATS line. St. Otto's has obtained drugs and drug consulting, dietary consulting, physical therapy, respiratory therapy, and kidney dialysis services under contracts with St. Gabriel's.

Prior to July 1, 1984, St. Otto's and St. Gabriel's had different boards of directors, administrators and financial officers. Each board reported to Franciscan Sisters Health Care, Inc. On July 1, 1984, Gerald Spinner became the president and chief executive officer of St. Otto's and St. Gabriel's and the executive director of Campus Services. The governing boards for both the hospital and nursing home were composed of the same individuals and shared the same directors and staff of plant services and finances after July 1, 1984.

The operations of the home and hospital became further integrated in February 1985. At that time, they began sharing the same computerized accounting system, the same materials management director and the same volunteer coordinator. On February 1, 1986, Campus Services' functions and personnel were transferred to St. Gabriel's Hospital, and the hospital and nursing home began using a unified payroll system and a common paymaster. By October 1986, the pastoral care, housekeeping, dietary (shared kitchen and kitchen staff), social service and public relations departments for both entities were the same. By April 1, 1987, the integration between St. Otto's and St. Gabriel's became virtually complete, and on that date, they began sharing all common operations under common directors and management.

### B. St. Francis' operation

Attached by a tunnel, St. Francis Home and the similarly named hospital in Breckenridge are part of one medical complex. The two share a steam boiler furnace and a storage area for bulk supplies, and the home has obtained social service coordination and medical records consulting from the hospital. St. Francis has also obtained drugs and drug consulting, dietary consulting and physical therapy services from the hospital. By January 1, 1986, the home and hospital came under a common board of directors. All departments common to

both facilities are combined under common directors and both facilities now have the same president.

### C. Medicare reporting

The two homes and two hospitals also participate in the federal Medicare program, which is administered by Blue Cross/Blue Shield of Minnesota. The hospitals are required to file annual cost reports, in which they must allocate the cost of services shared with the two homes using a "stepdown" methodology. A stepdown allocates the costs of nonrevenue-producing cost operations to revenue producing cost operations.

St. Otto's and St. Francis' federal Medicare costs were not reported through a cost report filed by the respective hospitals. In each case, the hospital cost reports filed with Medicare did not include all of the nursing home's costs. Thus, St. Francis Home showed only a minor percentage of its costs by allocation from St. Francis Hospital. St. Otto's Home did not show any of its costs by allocation from St. Gabriel's Hospital. Instead, St. Otto's and St. Gabriel's each recorded some costs allocated from the separate entity, Campus Services.

### D. Administrative proceedings

The two nursing homes sought to be classified as "hospital-attached nursing homes" under Minn.Rules 9549.0020, subp. 26 (1985) in order to be subject to higher rate limits than free-standing homes. Department rate-setting auditors denied that status and the two nursing homes appealed the denial under Minn.Stat. § 14.57 (1985). The department initiated a contested case proceeding pursuant to Minn.Stat. §§ 14.57–.62 (1985). An evidentiary hearing was conducted in April 1987, and the administrative law judge issued his report on June 30, 1987, recommending that the department decision be upheld. After the two nursing homes filed exceptions, the Deputy Commissioner modified the judge's rationale in further favor of the department and agreed with the decision to deny hospital-attached status.

Relators appeal by writ of certiorari.

## ISSUES

1. Do St. Otto's Home and St. Francis Home meet the definition of "hospital-attached nursing homes" under Minn.R. 9549.0020, subp. 26 (1985)?

2. Did the Commissioner improperly rely upon a state-commissioned study and a statement from an administrative law judge's report?

3. Does the denial of "hospital-attached" status violate the homes' equal protection rights?

## ANALYSIS

### I.

Relators argue that the Commissioner erred in finding that the two nursing homes did not have hospital-attached status. The scope of judicial review of the commissioner's contested case decision is set forth at Minn.Stat. § 14.69 (1986). The court shall determine whether the state agency's decision is:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious

Minn.Stat. § 14.69 (1986). The agency's decision is accorded a "presumption of correctness." *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977) ("deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience"). Where agency conclusions are based on legal, rather than factual, considerations, the court "need not defer to the agency's expertise." *See In re Minnesota Joint Underwriting Association*, 408 N.W.2d 599, 605 (Minn.Ct. App.1987).

The department has taken several steps toward equity in classifying nursing homes. Because their reimbursement rates depend upon operating costs, the department has attempted to establish rate classifications that relate to operating experience.

Prior to 1980, nursing homes which were C & NCs (convalescent and nursing care hospital units) were given better reimbursement rates by the state because they formed a part of a more costly hospital organization. At some point, it was determined that non-CN & C units that were part of a hospital organization should enjoy the same benefits. Further progression of the rules was aimed at identifying C & NC units, all formerly given a preferred rate, that fell short of the rules of integration, and to treat them as free-standing homes. It was thought some CN & C units were given benefits to which they were not entitled in the early 1980's as the rules presumed that all C & NC's were integrated and all freestanding homes were not. The new rules, promulgated in 1985, changed the presumption so that some CN & C units were not sufficient by themselves to obtain favored status under the rules. The nursing homes in this case at all relevant times were C & NC's.

The rule to be applied in this case, Minn.R. 9549.0020, subp. 26 (1985), defines hospital-attached status:

"Hospital-attached nursing home" means a nursing home which is under *common ownership and operation* with a licensed hospital *and* shares with the hospital the cost of *common service areas* such as nursing, dietary, housekeeping, laundry, plant operations, or administrative services *and* which is *required to use the stepdown method* of allocation by the Medicare program, Title XVIII of the Social Security Act, provided that the stepdown results in part of the cost of the shared areas to be allocated between the hospital and the nursing home, and

that the stepdown numbers are the numbers used for Medicare reimbursement. (Emphasis added).

1. Medicare filing requirement

To obtain hospital-attached status, the rule states that a nursing home be one "which is required to use the stepdown method of allocation by the Medicare program." Minn.R. 9549.0020, subp. 26 (1985). The parties agreed at the administrative hearing that this requirement is ambiguous because all facilities, including all free-standing nursing homes, must use the stepdown methodology in their own cost reports to allocate the costs from general service cost operations to revenue-producing cost operations.[1]

The judge and Commissioner ruled that the stepdown element was unsatisfied, because a single "combined" hospital cost report was not filed. The order states that higher nursing home cost experiences are tied to Medicare reporting requirements and that "a nursing home's costs are not inflated unless a joint Medicare cost report is filed." The judge added he was

persuaded that since 1980 the Department's intent has been to limit hospital-attached status to nursing homes that file the Medicare reports required of hospital-based SNFs.

In each of the nursing homes which is recognized by the department as "hospital-attached," the hospitals file combined cost reports with Medicare. In those cases, the nursing home is listed as a department of the hospital and all nursing home costs are included in the hospital's costs, and then allocated to the nursing home through the stepdown allocation procedure. Here, the respective hospital's costs filed with Medicare did not include most of the nursing home's costs. We agree with the agency's statement that

[g]iving [the homes] hospital-attached status could lower the other operating

---

1. The Medicare program requires certain facilities to use an accounting methodology known as a "stepdown" to allocate certain costs. In a stepdown, costs flow from nonrevenue producing cost "centers" to "revenue producing cost

centers." On ledgers showing this allocation, the lists of numbers take on a visual tiering appearance from the left of the page to the right, which lead to the name "stepdown."

cost limit and adversely affect hospital-attached facilities who have a significantly higher degree of cost sharing, and whose costs were inflated by hospital overhead, and it would also give [them] an efficiency incentive when [their] only efficiency results from the fact that hospital overhead was not transferred to [them] rather than [their] achievement of cost effectiveness compared to nursing homes whose other operating costs were inflated by allocations of hospital overhead.

■ The combined medicare report is an observable manifestation of the underlying financial practices of the hospital-attached nursing homes. It was not error for the agency to conclude that a combined report is required, as the granting of hospital-attached status would permit relators to obtain the benefits of higher limits and incentive payments in situations which are inconsistent with the purposes of the rules.

As a related issue, the nursing homes claim that the Commissioner's interpretation of the Medicare stepdown is invalid because it irrebuttably presumes that the nursing home and the hospital are receiving double reimbursement. The Commissioner has not contended that the nursing homes have engaged in double billing. It alleges that the requirement is to create an exception and a higher rate for those facilities which incur higher cost as demonstrated by their use of the combined Medicare format. The Commissioner's interpretation that the rule as amended required a combined report was not error.

### 2. Common operation

Minn.R. 9549.0020, subp. 26 requires that a hospital-attached nursing home be under "common operation" with a licensed hospital. In the administrative proceedings, relators argued that the requirement for "common operation" was synonymous with the rule requirement for "shared services." DHS argued that the term "common operation" means the organizational integration of the hospital and nursing home. Although not accepted by the administrative law judge, the department's view was made a part of the Commissioner's final decision in the case.

■ The Commissioner found, and respondent concedes, that each of the homes shares some services and coordinates activities with the attached hospital. The rules were amended in 1983, however, to distinguish between common operation and the sharing of services. The language defining common operation as the sharing of services was deleted and replaced with a requirement for common operation *and* the sharing of services. The next question is whether the Commissioner correctly found that the facts here do not show a common operation.

■ The Commissioner concluded that "common operation" requires "organizational integration" in the business context. To reach this conclusion, the Commissioner noted first that "operation" as used in the rule relates to the operation of businesses, because nursing homes are businesses. Second, when "referring to the common operation of businesses, one of the activities which must be shared equally is the management structure." The final step is that the management structure must be integrated. The federal Medicare definition of hospital-based nursing homes requires that such a home be "an integral and subordinate part of a hospital" and that the home and hospital be "financially integrated." *See* 45 Fed.Reg. 58,701 (1980). It logically follows that common operation requirement in the state rule would have the same meaning as the portions of the federal Medicare definition requiring integration of the operational activities of the hospital and nursing home.

The Commissioner's interpretation of the words "common operation" to include "integration" is not unreasonable, given the materials validly relied upon by the Commissioner. Relators do not dispute that under the Commissioner's definition, the homes and hospitals lack common operation. Thus, the only question is whether the Commissioner's requirement that the homes and hospitals be sufficiently integrated was error. Since we defer considerably to the agency, it was not error for the

Commissioner to conclude that the hospitals and homes were not commonly operated. *See Reserve Mining,* 256 N.W.2d at 824.

### 3. Shared services

The definition of hospital-attached nursing home in Minn.R. 9549.0020 subp. 26 (1985) requires that a nursing home share with the hospital the "cost" of common service areas such as nursing, dietary, housekeeping, laundry, plant operations, or administrative services. This is a departure from the previous rule which said "common operation shall be defined as the sharing of services."

■ The judge and Commissioner determined that St. Otto's and St. Francis did not meet the requirements of the rule. Relators argue that the judge and Commissioner developed a "new theory requiring a 'substantial sharing of services' between the hospital and nursing home." The judge stated in a memorandum incorporated by the Commissioner:

[T]he reimbursement rules give nursing homes whose other operating costs are inflated by allocations of hospital overhead higher limits on those costs. When little or no hospital overhead is allocated to a nursing home, it should not have special status and receive the higher limit, even if it shares some of the costs of common service areas with the hospital. Little or no hospital overhead was transferred to St. Otto's and St. Francis Home during the two years in issue. Therefore, they should not be given hospital-attached status.

The judge and Commissioner did not dispute that the homes and hospitals shared services contemplated by the rule. The facts indicate that each hospital and nursing home shared numerous services. The requirement of the new rule is that the nursing home share the "costs" of sharing services. The judge noted in his memorandum incorporated in the Commissioner's order:

The rule requires a sharing of the costs of common service areas. For the reasons previously mentioned, the Judge is persuaded that the "costs" referred to

were intended to be the costs allocated in a combined cost report filed with Medicare by a hospital-nursing home complex. The Department did not intend to recognize the costs allocated to nursing homes in other Medicare reports, even if some shared service costs are allocated between the two facilities in those reports.

The judge concluded that

[g]iving [the homes] hospital-attached status will not result in the double reimbursement of [their] costs, but it will permit [them] to obtain the benefits of limits and incentive payments in situations that were not intended and that are inconsistent with the purposes of the rules.

The standard applied by the Commissioner requiring that the home and hospital share substantial costs is not error, given the 1985 amendments to the rule.

### II.

■ Relators argue that the administrative judge and the Commissioner incorrectly relied on a department-commissioned study quoted in the adoption of Minn.R. 9549.0010–.0080 and not expressly made part of the record of this case. They object to the reliance on this study in concluding that only nursing homes filing combined Medicare reports qualify as "hospital-attached." The department argues that the quotation is part of the rule-making history of Minn.R. 9549.0010–.0080 and may be considered by the judge and Commissioner.

In administrative hearings, the rules of evidence are somewhat relaxed:

The judge may admit all evidence which possesses probative value, including hearsay, if it is the type of evidence on which reasonable, prudent persons are accustomed to rely in the conduct of their serious affairs.

Minn.R. 1400.7300 subp. 1 (1985). All evidence to be considered in the case must be made part of the record. Minn.R. 1400.-7300 subp. 2. No other factual information or evidence shall be considered in the determination of the case. *Id.* In addition, legislative history may be considered where statutory wording is not explicit. *See*

Minn.Stat. § 645.16(7) (1986); *Handle with Care v. Department of Human Services,* 406 N.W.2d 518, 522 (Minn.1987).

The disputed quote states:

The Department decided to group C & NCs separately on the advice of its consultant, Lewin & Associates. The consultant determined that since 99 percent of the C & NCs in the State were over the 60th percentile for other operating costs, they should be grouped separately to avoid the negative financial impact arraying them with other free-standing facilities would have. The Department's policy decision regarding the treatment of other operating costs of C & NC units establishes the need and reasonableness of the proposed rule. The Department may treat nursing homes differently when there is a rational basis for doing so. It may consider the fiscal impact of alternative classifications and its general goal for a neutral budget impact in grouping nursing homes for purposes of establishing cost limits.

The study supported the department's decision to treat free-standing and non-free-standing facilities differently for operating costs. The administrative law judge and Commissioner could properly consider the study as part of the rulemaking history of Minn.R. 9549.

Independent of the study report, there is evidence supporting the Commissioner's requirement of combined Medicare reports for hospital-attached status. A discussion of uniform cost reporting relating to Medicare appears elsewhere in the record, as does a rate notice of the Federal Health Care Financing Administration. Reliance on this study does not rise to the level of prejudicial error requiring a rehearing.

### III.

■ Relators argue that the Commissioner's interpretation of the rule violates the equal protection clause of the United States Constitution because the interpretation allegedly makes a distinction among nursing homes without a fair and substantial reason. *See New London Nursing Home, Inc. v. Lindeman, Department of Economic Security,* 382 N.W.2d 868, 871 (Minn.Ct.App.1986) ("differences imposed by a statute must not result in allowing one to escape a burden which has been imposed on another under substantially similar circumstances and conditions").

This argument is tied to the relators' argument that the Commissioner improperly found they did not meet the requirements of the rule to be a hospital-attached nursing home. Relators point to a history of granting "leeway" to Convalescent and Nursing Care units because they have higher costs than freestanding facilities, and note that they have been granted favored status in the past.

The Commissioner properly denied hospital-attached status to the homes to avoid a hardship on other homes which incurred higher costs because the Medicare cost allocation procedure results in the transfer of substantial hospital costs to the nursing homes. The rules do not currently look only at whether the home is a C & NC, but create an exception and higher cost limit for facilities which incur higher costs because they use the combined Medicare reporting format. The denial of hospital-attached status to relators does not amount to a denial of equal protection.

### DECISION

The Commissioner of Human Services properly concluded that relators are not hospital-attached nursing homes under Minn.R. 9549.0020. This determination was based on evidence properly considered and was not a denial of equal protection.

Affirmed.