**In the Matter of the Contested Case of GLENCOE AREA HEALTH CENTER, Relator,**

**v.**

**MINNESOTA DEPARTMENT OF HUMAN SERVICES, Respondent.**

**No. C2-88-2446.**

Court of Appeals of Minnesota.

June 13, 1989.

Review Denied Aug. 15, 1989.

K. Craig Wildfang, Siegel, Brill, Greupner & Duffy, P.A., Minneapolis, for relator.

Hubert H. Humphrey, III, Atty. Gen., Neil F. Scott, Marsha R. Gronseth, Special Asst. Attys. Gen., St. Paul, for respondent.

Heard, considered and decided by WOZNIAK, C.J., and FOLEY and NIERENGARTEN, JJ.

## OPINION

FOLEY, Judge.

This matter is before this court on the petition for writ of certiorari of relator Glencoe Area Health Center. Glencoe, a new facility receiving its first residents on May 1, 1984, challenges the action of the Commissioner of Human Services in sustaining Glencoe's property-related payment rates and particularly the offset of interest income against interest expense for the following periods: May 1, 1984 to September 30, 1985; October 1, 1985 to June 30, 1986; and July 1, 1986 to June 30, 1987.

The parties have stipulated to certain facts and those facts, together with documents and exhibits on file, the evidence and statutes and rules relevant thereto, sustain the action of the Commissioner. We affirm.

## FACTS

The parties' stipulation, which is incorporated by reference, presents the following factual situation. Glencoe is a non-proprietary, hospital-attached nursing home located in Glencoe, Minnesota, certified to participate in Minnesota's Medical Assistance Program. Its medical assistance reimbursement rates are set by the Department of Human Services pursuant to Minn.Stat. §§ 256B.41–256B.48 (1988) and Minn.R. 9549.0010–.0080 (1987). The Medical Assistance Program is a jointly funded federal-state program that provides medical care assistance for eligible persons and is administered in Minnesota by the Department of Human Services. *See* Minn.Stat. § 256.01, subd. 1 (1988).

From 1972 until July 1, 1983, nursing homes were reimbursed under a rate system found in Minn.R. 9510.0010–.0480 (1987), which is commonly referred to as "Rule 49." In 1983, the legislature implemented a new reimbursement system that would use a "rental value" approach for reimbursing the nursing homes' property costs. Minn. Laws 1983, ch. 199, § 12, codified at Minn.Stat. § 256B.431 (1988). Since the new system would not become effective until July 1985, the legislature directed the Department of Human Services to adopt a temporary method of reimbursement which would be effective from July 1, 1983 through June 30, 1985. Accordingly, the Department of Human Services implemented Temporary Rule 50 (also known as 12 MCAR §§ 2.05001–2.05016) until ultimately, Permanent Rule 50 became effective on June 17, 1985. (Minn.R. 9549.0010–.0080 (1987)).

Under Permanent Rule 50, medical assistance reimbursement rates for a rate year beginning on July 1 are set based on cost reports which are submitted by providers for the one-year period ending September 30 of the preceding year. Minn.R. 9549.0020, subp. 41 (1987).

The system to set rates for *a newly constructed nursing home*, however, is *not* the same. Initially, for a *new* facility to establish medical assistance reimbursement rates under Permanent Rule 50, it must submit a report of its estimated actual costs for a start-up period which is commonly referred to as the "interim period." Minn.R. 9549.0060, subp. 14. A. (1987). This interim period begins on the first day a resident is admitted to the facility and continues until September 30, not to exceed 17 months. At the end of the interim period, the facility submits a settle-up cost report which contains the actual costs incurred during this initial period. From the information contained in that report, a new rate, a settle-up rate, is then established for the interim period (or settle-up period). The Department of Human Services then retroactively adjusts the rates for the settle-up period, substituting the historical cost-based settle-up rates for the projected interim rates.

This settle-up cost report is then used to establish rates for three separate periods;

1. Settle-up rates for the interim period;

2. Rates for the nine-month period between the date of the settle-up cost report (September 30) and the beginning of the next rate year July 1; and

3. Rates for the next rate year commencing on July 1 following the interim period.

Glencoe's interim period began on May 1, 1984 which was the first day it admitted residents. Glencoe received interim medical assistance payment rates based on its estimated costs until September 30, 1985. Glencoe then submitted its settle-up cost report which reflected its actual costs incurred during the interim period. This September 30, 1985 settle-up cost report was used by the Department of Human Services to calculate

1. The settle-up rates for the period from May 1, 1984 through September 30, 1985;

2. The rates for the nine month period from October 1, 1985 through June 30, 1986; and

3. The rates for the rate year from July 1, 1986 through June 30, 1987.

In calculating these rates, the Department of Human Services relied on Permanent Rule 50, Temporary Rule 50, Rule 49, and Minn. Laws 1985, 1st Sp.Sess., ch. 3, § 31.

According to the Department of Human Services, a nursing home's rate is determined based largely on its allowable costs, and if costs are higher, the nursing home's rates will also be higher. Therefore, the Department of Human Service's offset of Glencoe's interest income against its interest expense, resulted in a reduction of the total allowable costs used to calculate Glencoe's medical assistance rates for periods beginning May 1, 1984 and continuing through June 30, 1987.

The matter was heard as a contested case under the Administrative Procedure Act. Minn.Stat. §§ 14.01–14.69 (1986). The referee sustained the offset of interest income against interest expense, and the matter was appealed to the Commissioner, who sustained the action of the department. Glencoe appeals.

## ISSUE

Did the Department of Human Services correctly offset Glencoe's interest income against its interest expense in determining Glencoe's property-related payment rates for various rate periods?

## ANALYSIS

*Standard of Review*

Our standard of review of an agency's decision has been set out in Minn.Stat. § 14.69 (1986) which provides:

In a judicial review under sections 14.-63 to 14.68, the court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error or law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

Further, an agency's decision enjoys a "presumption of correctness." *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977). Courts should show deference to the agency's expertise and special knowledge in the field of its training, education, and experience. *Id.*

Glencoe relies heavily on *St. Otto's Home v. Dept. of Human Services*, 437 N.W.2d 35 (Minn.1989), to warrant reversal here. For reasons hereinafter given, *St. Otto's* is distinguishable from this case and does not control decision here.

Prior to July 1, 1983, nursing homes were reimbursed pursuant to a rule commonly referred to as "Rule 49." The legislature replaced this system with a new system to take effect in July 1985. *See* Minn.Stat. § 256B.431. The new system uses a rental value approach to reimburse the nursing homes' property costs. To maintain the status quo pending the implementation of the new system in July 1985, the legislature directed the department to adopt a temporary method of reimbursement for property costs for the period from July 1, 1983 to June 30, 1985.

An understanding of the relationship of the provisions of Temporary Rule 50 and Permanent Rule 50 as well as Rule 49, all to each other and to the rates established, is important in reviewing the action of the Commissioner.

■ In order to set the nursing home rates, allowable costs are an essential consideration. Higher costs result in higher rates. Here, the department's offset of Glencoe's interest income against its interest expense had the effect of reducing the total allowable costs used to calculate Glencoe's medical assistance rates. The department acted pursuant to Rule 49 and offset $164,545.19 in non-operating income during the "settle-up" period.

To put this entire matter in proper focus, we adopt the rulemaking history and analysis of the department contained in the department's brief:

This rulemaking history clearly demonstrates that the Department was required to rely on Rule 49 for purposes of calculating property-related payment rates under Temporary Rule 50.

Temporary Rule 50 was adopted to serve as a bridge between Rule 49 and Permanent Rule 50. Neither the legislature nor the Department ever intended to establish a new property-related rate-setting structure in Temporary Rule 50. Both the plain language of the 1983 legislation (Minn. Laws 1983, ch. 199, § 12, subds. 3 and 4) and the rulemaking history of Temporary Rule 50 provide overwhelming evidence that the Department was required to continue to set property-related payment rates under Temporary Rule 50 exactly as they had been set under Rule 49.

The rulemaking history of Temporary Rule 50 explains exactly why "interest income" was deleted from the general definition of "applicable credits" in 12 MCAR § 2.05002 E. before final adoption of that rule. All of the written comments submitted by the nursing industry representatives to the Department on this issue suggested that this definition be clarified *because it was their understanding that property rates were to*

*continue to be set under Temporary Rule 50 exactly as they were set under Rule 49.* Under Minn.Stat. § 14.365(2) (1988), the comments received are part of the official rulemaking record.

Mr. Dale Thompson, writing in behalf of the Minnesota Association of Health Care facilities ("MAHCF"), stated:

Chapter 199 provides for a two-year freeze in property-related reimbursement. Despite that the proposed rules contain several provisions altering cost reimbursement. The Commissioner is only authorized to adopt rules maintaining the status quo in this area. All rules changing the reimbursement standards are illegal. * * * *Interest income should only be a reduction of interest expense,* and then only to the extent interest income is unrestricted.

Resp.App. B–15 (emphasis added).

Thomas W. Paul, the administrator for Crestview Lutheran Home, wrote that "[i]nterest income under old Rule [49] could be restricted by designated board option. This should · be maintained * * *." Resp.App. B–20.

Representatives of Abbott Northwestern Hospital and Ebenezer Society stated in their comments that:

With regard to property-related costs, however, *Chapter 199 clearly envisions a freeze and reliance on existing Rule 49* until the rental approach to property-related cost reimbursement is implemented. The law creates no general need for rules in this area.

Resp.App. B–26 (emphasis added).

Mr. William Hargis, speaking on behalf of Good Neighbor Care Centers, Inc., also commented on the proposed definition of "applicable credits," stating that:

[T]his term and principle is not in Chapter 199 nor in the prior rule. *Interest income should only be offset against the related non-allowable interest expense and then applied to allowable interest as is practiced under Rule 49.* We note that DPW was not given the authority to change property costs and this proposed change

attempts to change property cost reimbursement.

Resp.App. B–31 (emphasis added).

\* \* \* \* \* \*

In response to these comments by the nursing home industry to the Department's proposed Temporary Rule 50, the Commissioner amended the definition of "applicable credits" in 12 MCAR § 2.05002 E. to exclude "interest income" in order to "clarify that property cost reimbursement will continue to be done under old Rule 49." Resp.App. B–45. Therefore the deletion of the words "interest income" from the definition of "applicable credits" in the general definition section of Temporary Rule 50 does not reflect a change from Rule 49 to Temporary Rule 50 as Glencoe erroneously asserts, but rather, a specific finding by the Commissioner that the 1983 legislation required the Department to calculate property-related payment rates under Temporary Rule 50 exactly as they had been calculated under Rule 49.

There is no dispute that Rule 49 requires the Department to offset a facility's interest income against its interest expense in calculating the property-related reimbursement rate. The relevant provision of that rule provides as follows:

> Subp. 1. **Interest.** Except as provided in subpart 6 interest is an allowable cost for non-proprietary facilities only and will be classified as follows:
>
> A. Interest on capital indebtedness includes amortization of bond premium and discount and related financial costs. Capital indebtedness is defined as any loan that is applied to purchase fixed assets related to providing nursing care as defined in part 9510.0450, subp. 1. The form of indebtedness will include mortgages, bonds, notes, and debentures, where the principal is repaid over a period in excess of one year.
>
> \* \* \* \* \* \*
>
> Subp. 2. **Interest Income.** *Interest income will be a deduction from interest allowable* under subpart 1, item A or B.

Minn. Rules pt. 9510.0440 (1987) (emphasis added). (Emphasis in original.)

Against this background and because Glencoe was a new facility, the medical assistance reimbursement rates could not be set under Permanent Rule 50 based on "cost reports submitted by the provider for the one-year period ending September 30 of the preceding year." A new facility estimates costs for a start-up period, beginning with the first day a resident is admitted to the facility and continuing for a period of time not to exceed 17 months. In Glencoe's case, that interim period lasted from May 1, 1984 through September 30, 1985.

A facility then submits what is called a "settle-up" cost report reflecting the *costs actually* incurred during this initial period. Glencoe's settle-up cost report was used by the department to calculate:

1. The settle-up rates for the period from May 1, 1984 through September 30, 1985;

2. Rates for the nine-month period from October 1, 1985 through June 30, 1986; and

3. Rates for the rate year from July 1, 1986 through June 30, 1987.

In setting the rates for these three periods, the department applied Rule 49 and offset Glencoe's non-operating interest income against its claimed interest expense. This offset is clearly required by Rule 49.

To merely recite Permanent Rule 50, as Glencoe would have us do, without consideration of those provisions relating to new facilities or Temporary Rule 50, which requires application of the offset under Rule 49, is to disregard the objective of the statute to preserve the status quo until the new formula would take effect.

**SPECIAL RATES.** A newly constructed nursing home \* \* \* may, upon written application to the commissioner, receive an interim payment rate for reimbursement for property-related costs calculated pursuant to the statutes and rules *in effect on May 1, 1983* \* \* \* to be effective from the first day a medical assistance recipient resides in the home \* \* \*. \* \* \* The interim payment rate shall not

be in effect for more than 17 months. The commissioner shall establish, by temporary and permanent rules, procedures for determining the interim rate and for making a retroactive cost settle-up after the first year of operation;

1983 Minn. Laws ch. 199, § 12, subd. 4, codified at Minn.Stat. § 256B.431, subd. 4 (Supp.1983) (emphasis added).

The department followed this legislative directive and adopted both temporary and permanent rules to govern rates of newly constructed nursing homes. Under Permanent Rule 50, it is provided:

C. The *interim payment rate* for a nursing home which commenced construction prior to July 1, 1985 *is determined by 12 MCAR § 2.05014 (Temporary)* except that capital assets must be classified under parts 9549.0010 to 9549.0080.

\* \* \* \* \* \*

E. The *settle-up property-related payment rate and the property-related payment rate for the nine months following the settle-up* for a nursing home which commenced construction before July 1, 1985, *is determined under 12 MCAR § 2.05014 (Temporary).* The property-related payment rate for the rate year beginning July 1 following the nine-month period is determined under part 9549.0060.

Minn.R. 9549.0060, subpt. 14 C and E (1987) (emphasis added). Of significance as well is the procedure to determine rates for newly constructed nursing homes under Temporary Rule 50.

The property-related cost base for a newly constructed nursing home \* \* \* shall be determined by estimating the depreciation, interest, and investment allowance on the newly constructed nursing home or portion of a nursing home pursuant to the statutes *and rules in effect on May 1, 1983.* The property-related cost base shall be fixed at the level recognized at the time of the settle-up.

12 MCAR § 2.05011, pt. C (emphasis added).

Rule 49 was applied to calculate the interim property-related payment since that rule was in effect on May 1, 1983. (See Stipulated Fact # 5) There was a deletion of the words "interest income" from a general definition section of Temporary Rule 50, but there was also a specific provision in that rule which applied to *newly constructed homes.*

Glencoe argues that the deletion of the phrase "interest income" from the general definition of Temporary Rule 50 requires a holding that offset not be permitted. Glencoe contends the rules are confusing. We disagree.

We concur with the department that the relevant provisions of Temporary Rule 50 carry out the legislative intent to preserve the status quo in property cost reimbursement. We likewise concur with the department that the interest income offset was correctly used to determine the settle-up property rate and for the other two periods, October 1, 1985 through June 30, 1986 and the rate year beginning July 1, 1986.

To the argument of Glencoe that it is unfair and economically unsound to apply the settle-up rate to the following two rate periods when Glencoe did not earn this interest income during those periods, the Deputy Commissioner expressed it well when he said in his memo respecting this argument:

However, both Minn.Stat. § 256B.431 and Permanent Rule 50 establish a prospective rate-setting system with a payment rate based in large part on historical experience during a preceding reporting period. Consequently, costs incurred during one year will affect the rates paid during the next year. For a new facility, like Glencoe, the settle-up rate for the start-up period must be based on the historical experience during that period since no previous year existed. The payment rate for the following nine-month gap period and the succeeding rate year are also based on the settle-up cost report for the start-up period; i.e., the start-up period also serves as a reporting period for the gap period and succeeding rate year. The fact that the interest income earned during the start-up period

affects rates paid during more than one period is a consequence of this prospective rate-setting system.

In sustaining the Commissioner, we are mindful of the deference to be given to construction of a statute or rule by the department which has the responsibility to enforce the regulations. *See Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *In re Minnesota Joint Underwriting Association,* 408 N.W.2d 599 (Minn.Ct.App.1987); *Goodman v. State,* 282 N.W.2d 559 (Minn.1979); *Krumm v. R. A. Nadeau Co.,* 276 N.W.2d 641 (Minn. 1979). There should also be consideration of the rule-making history.

This is not a true case of first impression, but even if it were, deference should be given to the department. *Joint Underwriting,* 408 N.W.2d at 604–05.

Finally, we reiterate that *St. Otto* does not control the decision here. That case is distinguishable on its facts. In *St. Otto,* the department engaged in unpromulgated rulemaking, an entirely different issue from that present in the case before us. Here, the objective was to preserve the status quo for a period of time until the formula for "rental value" as the basis for medical assistance reimbursement became effective in 1985.

In *St. Otto,* the supreme court stated: It is not the present rule or the methods used to interpret it which disturbs us. Rather, it is the fact that the DHS granted relators hospital-attached status under the 1980 rule, but upon promulgation of an amended, yet similar, rule in 1985, revoked this status without apparent justification under the terms of the rule. *Id.* at 42. The supreme court held the Department of Human Services violated the Administrative Procedure Act. Here, the Commissioner followed both statute and rule to the end that Temporary Rule 50 serve as a bridge between Rule 49 and Permanent Rule 50 until the new formula became effective. In *St. Otto,* the supreme court restates the applicable scope of review: "An agency's decision is accorded a 'presumption of correctness.'" *Id.* at 39 (citing *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977)). That presumption of correctness is particularly applicable to the facts of this case.

Those active in the nursing home industry were fully conversant with the statute and the rules, were part of the rule-making history, and urged continuance of setting of property rates under Rule 49 to offset income interest from interest expense. Upon a fair consideration of the applicable statute and rules, the rates for the periods involved were correctly determined.

## DECISION

Affirmed.