In the Matter of the Claim Against the **GRAIN BUYER'S BOND OF MISCHEL GRAIN & SEED, WARREN, MN, BOND # 92770608627589**

No. C9–98–1814.

Court of Appeals of Minnesota.

April 20, 1999.

James A. Reding, Jr., Lars C. Erickson, Reding & Pilney, St. Paul, MN (for relator Auto–Owners Insurance Company)

Arthur A. Drenckhahn, Drenckhahn & Williams, P.A., Warren, MN (for respondent Paul Anderson)

Mike Hatch, Attorney General, Paschal O. Nwokocha, Assistant Attorney General, St. Paul, MN (for Department of Agriculture)

Paul L. Dinger, Minneapolis, MN (for Mischel Grain & Seed)

Considered and decided by HARTEN, Presiding Judge, SHUMAKER, Judge, and HUSPENI, Judge.

## OPINION

HUSPENI, Judge.[*]

Relator challenges the Commissioner of Agriculture's decision approving and adopting the ALJ's recommendation and ordering relator to pay the maximum liability amount of a grain-buyer's bond. Because we conclude that the commissioner erred as a matter of law in deciding that all of the grain seller's claims were timely filed and covered by the bond, we reverse.

## FACTS

Mischel Grain and Seed Company (Mischel) was a licensed grain buyer through June 30, 1996, and carried a $30,000 grain-buyer's bond issued by relator Auto–Owners Insurance Company (Auto–Owners). Although Mischel did not renew its grain-buyer license, its bond remained effective until February 28, 1997.

Respondent Paul Anderson sold Mischel $32,676.11 worth of sunflower seeds in 1996. Anderson delivered seeds on the following dates: March 12, 14, 28, and 29; April 1, 17, 22 and 23; and July 22, 1996. Anderson first requested payment for the seeds two or three weeks after the final delivery. Mischel did not make any payments for the seeds.

On December 27, 1996, Anderson filed a claim with the Minnesota Department of

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

Agriculture (MDA), requesting recovery pursuant to Mischel's grain-buyer's bond. A MDA warehouse examiner concluded that only the claim for the shipment on July 22, 1996, was filed within the required time limit of 180 days after the breach. The examiner recommended that Anderson receive $6,281.83 for the July 22 shipment.

Anderson requested and was given a contested case hearing, after which the ALJ determined that the deliveries were multiple shipments of one cash sale and that the breach of contract did not occur until July 24, 1996, 48 hours after the final delivery. The ALJ recommended that Anderson receive the bond's maximum liability amount, Auto–Owners and the MDA filed exceptions to the ALJ's recommendation, and the Commissioner of Agriculture approved and adopted the ALJ's recommendation in its entirety. Auto–Owners petitioned this court for writ of certiorari.

## ISSUE

Did the grain seller make a timely claim against the grain-buyer's bond?

## ANALYSIS

■ A reviewing court may reverse or modify an agency's decision only if

the administrative finding, inferences, conclusion, or decisions are:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

Minn.Stat. § 14.69 (1998). When an agency's decision is based on statutory construction, a legal question exists, and a reviewing court applies de novo review. *St. Otto's Home v.*

*Minnesota Dep't of Human Servs.*, 437 N.W.2d 35, 39–40 (Minn.1989).

The Grain Buyers Act, Minn.Stat. ch. 223 (1998), delineates only two kinds of grain sales: cash sales and voluntary extension of credit contracts. *See* Minn.Stat. § 223.16, subd. 2a (1998) (defining cash sale), subd. 16 (1998) (defining voluntary extension of credit contract). A cash sale is defined as

(a) a sale for which payment is tendered to the seller not later than the close of business on the next business day after the sale, either in cash or by check, or by mailing or wiring funds to the seller's account in the amount of at least 80 percent of the value of the grain at delivery; or

(b) a sale of a shipment of grain which is part of a multiple shipment sale, for which a scale ticket clearly marked "CASH" has been received by the seller before completion of the entire sale, and for which payment is tendered in cash or by check not later than ten days after the sale of that shipment, except that when the entire sale is completed, payment is tendered in cash or by check not later than the close of business on the next business day, or within 48 hours, whichever is later.

Minn.Stat. § 223.16, subd. 2a.

■ The ALJ determined that this was a cash sale, and Auto–Owners concedes this point on appeal.[1] Although Auto–Owners does not dispute that this was a cash sale, it asserts that the commissioner erroneously interpreted Minn.Stat. § 223.17, subd. 5 (1998), which describes the method of payment for cash sales made in multiple shipments:

For a cash sale of a shipment of grain which is part of a multiple shipment sale, the grain buyer shall tender payment to the seller in cash or by check not later than ten days after the sale of that shipment, except that when the entire sale is completed, payment shall be tendered not later than the close of business on the next day, or within 48 hours, whichever is later.

---

1. In *In re Claims Against Grain Buyer's Bond No. 877706–08624237*, 486 N.W.2d 466, 469 (Minn. App.1992), a divided panel of this court recognized that Minn.Stat. ch. 223 is unclear and held that all contracts that do not meet the specific requirements of a voluntary extension contract "are to be treated as cash sales."

Minn.Stat. § 223.17, subd. 5. In his recommendation, which was adopted by the commissioner, the ALJ interpreted subdivision 5 to permit payment in a multiple-shipment cash sale to be made either after each shipment or after completion of the entire sale.

In challenging the commissioner's decision, Auto–Owners argues that subdivision 5 requires payment for each of Anderson's deliveries to Mischel within ten days of each delivery and that Anderson had 180 days to file a claim on the buyer's bond from the date each shipment payment was due. *See* Minn. Stat. § 223.17, subd. 7 (1998) (stating producer claiming a breach of contract by a grain purchaser must file a claim "with the commissioner within 180 days of the breach of the contract"). Auto–Owners further argues that, as the MDA originally determined, only the portion of the claim related to the July shipment fell within the 180 days for filing a claim. Auto–Owners' arguments are persuasive.

▮ "The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (1998). When a statute is unambiguous, its plain meaning is applied. *State by Beaulieu v. RSJ, Inc.,* 552 N.W.2d 695, 701 (Minn.1996). If a statute is ambiguous, the court must ascertain the probable legislative intent and "give the statute a construction that is consistent with that intent." *Tuma v. Commissioner of Econ. Sec.,* 386 N.W.2d 702, 706 (Minn.1986).

▮ We see no ambiguity in Minn.Stat. § 223.17, subd. 5. In addressing a multiple-shipment sale, the statute requires that payment be made not later than ten days after the sale of *that* shipment. The statutory reference to "that shipment" compels an interpretation, we believe, that each shipment in a multiple-shipment sale triggers its own ten-day period for payment. The final clause of subdivision 5 then can be interpreted consistently to provide a shorter 48–hour period for payment after the entire multiple shipment sale is completed.[2]

Even if we were to conclude that Minn. Stat. § 223.17, subd. 5, is ambiguous, we would attempt to determine the probable legislative intent. *See Tuma,* 386 N.W.2d at 706 (stating court must construe statute consistent with probable legislative intent). Legislative intent may be ascertained by considering "[t]he consequences of a particular interpretation." Minn.Stat. § 645.16(6). In filing exceptions to the ALJ's recommendation, the MDA addressed consequences that might result from a misinterpretation of subdivision 5:

> The time limits on filing claims are intended to prevent a single seller from continuing to deliver grain even when he has not been paid. The early warning provided by prompt claims allows the department to take action to prevent further defaults and deliveries by unsuspecting growers.

> The ALJ's interpretation would, in * * * an extreme case, allow a farmer to make periodic deliveries every month for the next five years with all deliveries covered by the grain buyer's bond if the farmer testifies that he or she expected payment after the last delivery. Unless the bond is set at an impossibly high level, such an interpretation would harm other producers who seek redress in a timely fashion by using up the entire bond principal to pay off claims of those who kept delivering after payment should have been made under the explicit provisions of the statute.

> * * * The arrangement between Mr. Anderson and Mischel has the same negative effect as a voluntary extension of credit, and should not be covered by grain buyer's bond.

The concerns expressed by MDA are valid and are answered, we believe, by interpreting Minn.Stat. § 223.17, subd. 5, to require payment to be made within ten days after each shipment in a multi-shipment sale, subject to the shorter payment period upon completion of the sale. We conclude that the

2. Under this interpretation, if a multiple-shipment sale involved a total of four shipments, June 1, 2,10 and 15, payment for the June 1 and 2 shipments would be due on June 11 and 12, respectively. Payment for the June 10 and 15 shipments, however, would be due within 48 hours after the June 15 shipment.

legislature did not intend subdivision 5 to permit payments to be made *either* within ten days after a shipment *or* within 48 hours after the last shipment, regardless of when that final shipment might take place.

Finally, Anderson argues that because he and Mischel contracted that payment would be due only after delivery of the entire bin of sunflower seeds, Minn.Stat. § 223.17, subd. 7, supports his claim against the bond. We find Anderson's reliance on subdivision 7 to be misplaced. While subdivision 7 permits a claim to be filed "within 180 days of the breach of the contract," the contract referred to in that section must be one complying with the requirements of subdivision 5. The Anderson/Mischel contract did not comply with the statute. We cannot read the statute to permit parties to "draft around" and ignore its requirements and yet claim against the bond when their noncomplying contract is breached.

As noted earlier, the Grain Buyers Act recognizes only two types of sales: cash sales and voluntary extension of credit contracts. The parties do not dispute that this was a cash sale. Thus, to recover under the grain-buyer's bond, Anderson was required to file a claim within 180 days of the breach of the cash-sale contract as defined by the Grain Buyers Act. *See In re Claims Against Grain Buyer's Bond No. 877706-08624237,* 486 N.W.2d 466, 469 (Minn.App.1992) ("If there is a breach of a cash sale grain contract, Minn.Stat. § 223.17, subd. 7, requires a grain producer to file a claim with the Commissioner within 180 days of the breach in order to recover on the bond."). Thus, only the claim made by Anderson in connection with the July 1996 shipment is timely under the statute.

## DECISION

The Commissioner of Agriculture erred by deciding that Minn.Stat. § 223.17, subd. 5, permits multiple grain shipments to be paid for either ten days after each shipment *or* within 48 hours after the final shipment. The statute unambiguously states that payment is due within ten days after each shipment, *except that* all payments are due within 48 hours after completion of the entire sale.

Thus, Anderson is entitled to recover under the grain-buyer's bond only the amount due for the July 22, 1996 shipment. Breach of the cash-sale contract as to that shipment occurred within 180 days of December 27, 1996, the date Anderson filed his claim with the MDA. Payment for all other shipments was due more than 180 days prior to the date Anderson filed his claim.

**Reversed.**