In the Matter of the Contested Cases of ST. OTTO'S HOME, Little Falls, Minnesota, and St. Francis Home, Breckenridge, Minnesota, Petitioners, Relators,

v.

MINNESOTA DEPARTMENT OF HUMAN SERVICES, Respondent.

In the Matter of the Contested Case of LUTHER HAVEN NURSING HOME, Montevideo, Minnesota, Petitioner, Relator,

v.

MINNESOTA DEPARTMENT OF HUMAN SERVICES, Respondent.

Nos. C7–87–2514, C2–88–3.

Supreme Court of Minnesota.

March 10, 1989.

Steve M. Mihalchik, Samuel D. Orbovich, Minneapolis, for petitioners, relators.

Hubert H. Humphrey, III, Atty. Gen., John L. Kirwin, Asst. Atty. Gen., St. Paul, for respondent.

YETKA, Justice.

Relators, St. Otto's Home, St. Francis Home and Luther Haven Nursing Home, are appealing from a decision of the Minnesota Court of Appeals, which affirmed the Department of Human Services' (hereinafter DHS) determination that they were not "hospital-attached nursing homes" under Minn.R. 9549.0020, subp. 26 (Supp.1986) of the medical assistance rate setting rules. We reverse.

After denial of relators' request for hospital-attached status and the homes' subsequent appeal, DHS initiated two contested case proceedings pursuant to Minn.Stat. §§ 14.57–.62 (1986)—one for St. Otto's and St. Francis and another for Luther Haven. In each case, the administrative law judge recommended that the DHS's determinations be upheld. On December 3, 1987, the acting DHS Commissioner further modified the administrative law judge's rationale in favor of the DHS and agreed with the decision to deny relators hospital-attached status. The nursing homes appealed to the Minnesota Court of Appeals, which subsequently affirmed the commissioner's decision. *St. Otto's Home v. Dep't of Human Serv.*, 425 N.W.2d 252 (Minn.App.1988); *Luther Haven Nursing Home v. Dep't of Human Serv.*, 425 N.W.2d 260 (Minn.App. 1988). This court granted relators' petition for review and ordered that the cases be consolidated.

The dispute in this case centers on the DHS's interpretation of Minn.R. 9549.0020, subp. 26 (Supp.1986) (promulgated in 1985; *see* 9 State Reg. 1716, 2659 (1985)). Relators are three Minnesota nursing homes which participate in the state's medical assistance (Medicaid) program. Through this program, homes which provide care for the needy and otherwise participate are reimbursed for their costs at payment rates set by the DHS pursuant to the state rate-setting rules. *See* Minn.R. 9549.0010–.0090 (1987). The total payment rate is a composite of several rates, including the operating cost payment rate. Minn.R. 9549.-0020, subp. 44 (Supp.1986). Nursing homes which are classified as "hospital-attached" under Minn.R. 9549.0020, subp. 26 generally have higher operating costs and are given a higher cost rate limit than homes classified as "free standing." Hospital-attached nursing homes incur higher operating costs for several reasons. Relators point out that nursing homes attached to hospitals must pay their workers wages comparable to those of hospital workers and often have higher standards of care. The DHS does not dispute this, but contends that the primary reason for the higher costs is that the combined federal Medicare cost report used by most hospital-nursing home complexes shifts substantial hospital costs to the nursing homes.

Franciscan Sisters Health Care, Inc., a corporation formed by an order of Catholic nuns who provide a variety of health care services in Minnesota, own and operate St. Otto's Home and St. Gabriel's Hospital in Little Falls and St. Francis Home and Hospital in Breckenridge. Both nursing homes are physically attached to the respective hospitals by underground tunnels which are used to transport patients, supplies and personnel between the two. Both homes share services with their hospitals. Through Campus Services, an organization consisting of various administrators, St. Otto's Home and St. Gabriel's Hospital share a variety of services, including a power plant, laundry, maintenance, biomedical engineering, administration, security and management.

St. Francis Home and Hospital share a steam boiler furnace and a storage area for bulk supplies. Hospital personnel has provided the home with social service coordination, medical records consultation, drugs

and drug consultation, dietary consultation and physical therapy services.

Prior to July 1, 1984, St. Otto's and St. Gabriel's had different boards of directors, administrators and financial officers. Since then, the home and the hospital have become progressively more integrated. Effective July 1, 1984, St. Otto's and St. Gabriel's were headed by a common president and chief executive officer and shared the same directors and staff for personnel, engineering and finance. The hospital and home began using the same computerized accounting system, materials management director and volunteer coordinator in February of 1985. On April 1, 1987, they began sharing all common operations under common directors and management and the integration between them was virtually complete.

Before January 1, 1986, the chief executive officers of St. Francis Home and Hospital were employees of Franciscan Sisters Health Care, Inc., and reported to its vice president of health operations. On January 1, 1986, the home and hospital were governed by the same board of directors and president. All departments common to both facilities were combined under common direction and other operations became further integrated.

Both St. Otto's and St. Francis exceeded operating cost limits for free-standing nursing homes during the two rate years (1985 and 1986) at issue. According to the assistant vice president of finance for Franciscan Sister's Health Care, denial of hospital-attached status would cost St. Otto's home approximately $3.71 per resident per day and St. Francis would lose $1.30 per resident per day.

Luther Haven is a non-profit corporation operating a nursing home in Montevideo, Minnesota. Prior to 1972, Luther Haven was classified as a "free standing" nursing home. Sometime that year, the City of Montevideo and Chippewa County informed Luther Haven of their intention to build a new hospital. Luther Haven agreed to provide services for the hospital and link its nursing home by tunnel to the hospital in exchange for the city's promise to approve

and finance the nursing home's expansion and retire its existing debt by issuing revenue bonds. In order to obtain financing, Luther Haven conveyed the nursing home land and buildings to the city which then leased them back to Luther Haven for 25 years. During the lease term, Luther Haven is required to pay rent sufficient to cover the principal, interest and other costs on the bonds issued by the city. Luther Haven is authorized to purchase the land and buildings at any time for $100 plus the outstanding amount of revenue bond debt. Luther Haven's audit reports treated this sale and lease-back transaction as a financing arrangement.

In 1975, the Chippewa County–Montevideo Hospital was constructed adjacent to Luther Haven. The hospital is attached by a tunnel to Luther Haven to form a medical complex which also includes a clinic. Both the hospital and Luther Haven acknowledge that they are running a joint facility. They share a variety of services and facilities, including a boiler, water softener, staff dining area, laundry, garages, air-conditioning, materials management, employee lockers, connecting links, an employee parking lot and nurse education programs. Luther Haven and the hospital have separate boards of directors although each has a shared services committee. These two committees meet together to confer on shared services and matters of common interest between Luther Haven and the hospital.

St. Otto's, St. Francis and Luther Haven each, with their respective hospitals, participates in the federal Medicare program, which is administered by Blue Cross/Blue Shield of Minnesota. Medicare requires that all three hospitals file annual cost reports using a step-down methodology to allocate the cost of services shared with the nursing homes. A step-down is an accounting procedure which allocates the costs of non-revenue-producing cost operations to revenue-producing cost operations. None of the nursing homes' costs were included as separate cost centers in the step-down calculations of their hospitals' Medicare reports. This is in contrast to approximately

65 other Minnesota nursing homes which the DHS recognizes as hospital-attached— the step-down cost reports filed by those hospitals uniformly list the nursing home as a department of the hospital and all the home's costs are allocated in the hospital step-down. Those 65 nursing homes receive virtually all of their operating costs from their respective hospitals in these step-down reports, which are referred to as "combined" step-down reports.

While St. Francis Home was not listed as a cost center on the St. Francis Hospital Medicare cost report during the rate years in issue, it received a minor percentage of its costs by allocation from the hospital. St. Otto's did not receive any of its costs from St. Gabriel; instead, it received its portion of the cost of shared services by allocation from Campus Services, a separate entity, whose step-down reports were filed by the hospital. As the Medicare filing requirement is not at issue in regard to Luther Haven, the record contains little information concerning its Medicare filing requirement.

Since 1972, the DHS rules have given preferential rate treatment to hospital-attached nursing homes. Prior to 1980, a hospital-attached facility was equated with a convalescent and nursing care unit (C& NC). The Department of Health generally defines a C&NC unit as a nursing home operated in conjunction with a hospital when the nursing home has a direct physical link with the hospital permitting the indoor movement of patients between the two. *See* Minn.R. 4655.0100, subp. 4 (1987). All three nursing homes in this case were classified as C&NC units and were treated as hospital-attached nursing homes by the DHS.

In 1980, the DHS amended the rate-setting structure so that homes operated in conjunction with hospitals could be treated as hospital-attached facilities even if they were not physically attached to the hospital.

Concern about rising health costs caused the legislature to revise the reimbursement system for the biennium beginning July 1, 1983. The legislature required that the DHS group all C&NC units into one group for purposes of determining reimbursements for operating costs until groups could be established according to resident needs. *See* Minn.Stat. § 256B.431, subd. 1 (Supp.1983). After the 1983 directive, all three homes were still classified as hospital-attached nursing homes.

In 1985, permanent rules implementing part of the new rate-setting methodology required by the legislature became effective. The new, permanent rule no longer equates "common operation" with shared services and specifically requires that the nursing home use a step-down method of allocation. Other than those changes, the language of the two rules is very similar and the intent appears to be the same. For a comparison, we are setting out herein both the former rule (proposed at 4 State Reg. 1531 and adopted at 5 State Reg. 1023 (1980)) effective in 1980 and the rule adopted in 1985.

*1980 Rule:*
    Hospital attached facilities will include those facilities which are under common ownership and operation with a licensed hospital and are required to adhere to uniform cost reporting for governmental reimbursement programs. Common operation shall be defined as the sharing of services, such as nursing services, dietary, housekeeping, laundry, plant operations, and/or administrative. The nursing care limitation under (part 9510.0310) and the investment per bed limitation under part 9510.0360, subpart 1 will be waived when the Medicare cost allocation factors result in these limitations being exceeded. Costs between hospitals and attached facilities must be allocated by the "Medicare Worksheet B" using Medicare allocation factors for the following three cost groups: all expense classifications without depreciation, administration and general; depreciation; administration and general.

12 MCAR § 2.049 C.4c (1982).

*1985 Rule:*
    "Hospital-attached nursing home" means a nursing home which is under

common ownership and operation with a licensed hospital and shares with the hospital the cost of common service areas such as nursing, dietary, housekeeping, laundry, plant operations, or administrative services and which is required to use the stepdown method of allocation by the Medicare program, title XVIII of the Social Security Act, provided that the stepdown results in part of the cost of the shared areas to be allocated between the hospital and the nursing home, and that the stepdown numbers are the numbers used for Medicare reimbursement.

Minn.R. 9549.0020, subp. 26 (Supp.1986).

Following the promulgation of the permanent rule in 1985, the DHS denied the homes' claims for hospital-attached status. After contested case proceedings, the ALJ recommended that all three homes be denied hospital-attached status. The ALJ found that, during the rate years beginning November 1, 1985, and July 1, 1986, St. Otto's and St. Francis did not share costs with the hospitals and, therefore, were not required to file Medicare step-down reports. In a separate contested case proceeding, the ALJ denied Luther Haven's claim of hospital-attached status for the rate year beginning November 1, 1985, on the basis that it was not under common ownership with Chippewa County–Montevideo Hospital.

After St. Otto's and St. Francis filed exceptions to the ALJ recommendations, the acting commissioner of the DHS reviewed the cases and adopted most of the ALJ's reasoning and recommendations. The commissioner also modified the ALJ's conclusions by ruling that, contrary to the ALJ's finding, none of the nursing homes were in common operation with their attached hospitals.

The issues raised on this consolidated appeal are:

    I.  Did the commissioner properly interpret Minn.R. 9549.0020, subp. 26 (Supp.1986)?

   II.  Did the commissioner's interpretation of Minn.R. 9549.0020, subp. 26 (Supp.1986) constitute the improper promulgation of a new rule?

  III.  Did the ALJ and the commissioner improperly consider evidence that was not in the record?

  IV.  Did the commissioner's denial of hospital-attached status deny relators equal protection of the law?

## I.

In their brief, relators questioned the correctness of the commissioner's interpretation of Minn.R. 9549.0020, subp. 26; however, at oral argument before this court, relators indicated that they were not challenging the reasonableness of the commissioner's interpretation. Nevertheless, the DHS's sudden departure from its past interpretation of similar terms warrants an inquiry into the propriety of the commissioner's interpretation.

Before examining the commissioner's interpretation of the rule, it is necessary to clarify the applicable scope of review. An agency's decision is accorded a "presumption of correctness." *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977). This court may reverse or modify the agency's decision only

if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) *Affected by other error of law;* or

(e) Unsupported by substantial evidence in view of the entire record as submitted or

(f) Arbitrary or capricious.

Minn.Stat. § 14.69 (1988) (emphasis added).

■ When a decision turns on the meaning of words in a statute or regulation, a legal question is presented. *Northern Natural Gas Co. v. O'Malley*, 277 F.2d 128, 137 (8th Cir.1960) (citing *Trust of Bingham v. Commissioner*, 325 U.S. 365, 371, 65 S.Ct. 1232, 1235, 89 L.Ed. 1670 (1945)). In considering such questions of law, reviewing courts are not bound by the

decision of the agency and need not defer to agency expertise. *State by McClure v. Sports & Health Club,* 370 N.W.2d 844, 854 n. 17 (Minn.1985); *No Power Line Inc. v. Minnesota Envtl. Quality Council,* 262 N.W.2d 312, 320 (Minn.1977). When the agency's construction of its own regulation is at issue, however, considerable deference is given to the agency interpretation, especially when the relevant language is unclear or susceptible to different interpretations. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Resident v. Noot,* 305 N.W.2d 311, 312 (Minn.1981). If a regulation is ambiguous, agency interpretation will generally be upheld if it is reasonable. *See Aluminum Co. v. Central Lincoln Peoples' Util. Dist.,* 467 U.S. 380, 389, 104 S.Ct. 2472, 2479, 81 L.Ed.2d 301 (1984); *Udall,* 380 U.S. at 18, 85 S.Ct. at 802. No deference is given to the agency interpretation if the language of the regulation is clear and capable of understanding; therefore, the court may substitute its own judgment. *Resident,* 305 N.W.2d at 312; *Shea v. Vialpando,* 416 U.S. 251, 262 n. 11, 94 S.Ct. 1746, 1754 n. 11, 40 L.Ed.2d 120 (1974).[1]

Utilizing the above scope of review, we must now determine whether the commissioner properly defined the terms contained in Minn.R. 9549.0020, subp. 26 (1985).

Minn.R. 9549.0020, subp. 26 requires that a nursing home must be under common ownership with a licensed hospital in order to be classified as hospital-attached. The commissioner ruled that Luther Haven was not under common ownership with the Chippewa County–Montevideo Hospital. The primary rationale of the commissioner was that a mere legal interest in the land

and building where a nursing home business is conducted does not, without more, constitute ownership of a nursing home. The commissioner adopted the ALJ's reasoning that the transaction in which the city received fee title to the land and building was only a financing arrangement securing rights over property to protect bondholders. Therefore, the city was only an equitable mortgagee and, under Minnesota law, is not considered an owner. *See Gilliland v. Port Authority of St. Paul,* 270 N.W.2d 743, 747 (Minn.1978); *Romanchuk v. Plotkin,* 215 Minn. 156, 161, 9 N.W.2d 421, 424–25 (1943) (mortgagee has only a lien on property securing the mortgage; the right of ownership and possession remains with the mortgagor).

Relators disagree with the commissioner's definition of common ownership and argue that the city's legal interest in Luther Haven's land and buildings was sufficient to render it a co-owner of the nursing home.

The ambiguity of the term "common ownership" requires that this court uphold the agency's definition if it is reasonable. The word "reasonable" is generally found to be synonymous with "fair," "just," "equitable" and "sensible." *Quellet v. Shapiro,* 3 Conn.Cir.Ct. 268, 272, 212 A.2d 708, 710 (1965); *Anderson v. St. Louis–San Francisco Ry. Co.,* 367 S.W.2d 657, 660 (Mo.Ct.App.1963). Keeping these meanings in mind, it is difficult to find the DHS definition of "common ownership" reasonable. Importantly, common ownership was also a requirement of the 1980 rule and, from 1980 to 1985, the DHS classified Luther Haven as a hospital-attached nursing

---

**1.** In his administrative law treatise, Professor Davis provides a detailed analysis of the United States Supreme Court's often uncertain scope of review for questions of law. Professor Davis states that: "[T]he Supreme Court has long maintained two lines of cases on the scope of review of applying law to undisputed or established facts. In one line, the Court substitutes judgement, and in the other line it uses a reasonableness or rational basis test." 5 Davis, *Admin. Law Treatise* § 29.11 at 375 (2d ed. 1984). After a detailed examination of both lines of Supreme Court cases, Professor Davis concludes:

The fundamental about scope of review of application of law to facts is that the Court maximizes its own discretionary power to choose in each case between substituting judgement and using a reasonableness test. When the Court goes either way, it makes law on the substantive question, but it does not make law on scope of review; it merely exercises its discretionary power to go either way on a scope of a review, and it usually refrains from making any explanation of why it does what it does with respect to scope of review. *Id.* § 29.12 at 385.

home under this rule. Now, the DHS is attempting to amend the de facto definition of "common ownership" without any explanation or warning to the nursing homes. To allow the DHS to do so would be unfair and unreasonable.

█ The ALJ ruled that the common operation requirement of Minn.R. 9549.0020, subp. 26 meant merely that a hospital and a hospital-attached nursing home must be operated as a joint activity or in conjunction with each other. Using this definition, the ALJ found that all three nursing homes were in common operation with their hospitals. The commissioner rejected the ALJ's conclusion and held that "common operation" meant the total organizational integration of a hospital and nursing home from an accounting, administrative and functional viewpoint. The commissioner ruled that none of the nursing homes met this definition of "common operation."

The fact that the relators, the ALJ and the commissioner each ascribed different meanings to "common operation" evidences the term's ambiguity. Accordingly, we look to see if the commissioner's definition was reasonable.

Despite the commissioner's reliance on recognized principles of statutory construction, his definition of common operation was neither reasonable nor fair. From 1980 to 1985, all three homes were classified as hospital-attached under a rule which contained the term "common operation." Although the rule was amended in 1985 so that "common operation" was no longer synonymous with "shared services," the DHS failed to give any indication to the nursing homes that "common operation" would be given such a restrictive definition. In light of the DHS's past definition of "common operation," its present definition is clearly unreasonable.

Minn.R. 9549.0020, subp. 26 also requires that a hospital-attached nursing home share the "cost" of common service areas such as nursing, dietary, housekeeping, laundry, plant operations and administrative services. Recognizing that the sharing-of-costs terminology was ambiguous, the ALJ looked to the purposes of Minn.R. 9549.0020, subp. 26 and the consequences of the possible alternatives to provide the proper interpretation.

The ALJ first found that the main purpose of Minn.R. 9549.0020, subp. 26, as amended in 1985, was to identify and compensate those nursing homes which had higher operating costs because of the transfer of a hospital's overhead costs to the nursing home under Medicare's cost allocation (step-down) requirement. To interpret the rule otherwise, the ALJ reasoned, would "give a higher limit and incentive payments to nursing homes whose costs are not inflated by Medicare reporting requirements and who are not actually operating efficiently but those whose costs are lower merely because they do not share and report their costs in the same manner as most hospital-attached facilities do." Accordingly, the ALJ reasoned that the "costs" to be shared in Minn.R. 9549.0020, subp. 26 were intended to be the costs allocated in a combined cost report filed with Medicare by a hospital-nursing home complex.

Again, we find that the ALJ and the commissioner's interpretation is unreasonable under the circumstances. First, each nursing home met the literal requirements of the rule in that they each share some costs with their respective hospitals. Second, there is no indication from the face of the rule that a combined cost report was required. Lastly, the DHS failed to provide any language sufficient to warn relators that their past cost-sharing practices would no longer be sufficient to meet the requirements of the rule.

The last term in the rule at issue is the Medicare filing requirement. To obtain hospital-attached status, a nursing home must be one "which is required to use the stepdown method of allocation by the Medicare program * * *." Minn.R. 9549.0020, subp. 26 (Supp.1986). The ALJ and the commissioner found that the relators did not satisfy this requirement because none of the hospitals filed a single "combined"

hospital cost report.[2] On appeal, relators argue that the ALJ's and the commissioner's definition is not supported by the plain meaning of the rule.

The Medicare filing requirement language lists three requirements: (1) the home is required to use step-down method of allocation by the Medicare program, (2) the step-down results in part of the cost of the shared areas being allocated between the hospital and home and (3) the step-down numbers are the numbers used for Medicare reimbursement. *Id.*

While none of the hospitals attached to the relator homes filed the "combined" cost report referred to by the commissioner, each home met the literal requirements of the Medicare filing provision. Each hospital was required to use the step-down method of allocation. These step-downs resulted in part of the cost of the shared areas being allocated between the hospital and the home and, additionally, the step-down numbers were used for Medicare reimbursement. The terms of the Medicare filing requirement language are clear and unambiguous.[3] Therefore, we do not defer to the agency's expertise. *See Resident,* 305 N.W.2d at 312.

The DHS contends that interpreting the rule to require combined Medicare cost reports is consistent with its purpose of providing higher operating cost limits only to those homes which are likely to have higher costs because of Medicare cost-shifting. This claim has some merit due to the fundamental principle of statutory interpretation that form should not be exalted over substance and literal construction should not override general policy and objectives of the law. *Krumm v. R.A. Nadeau Co.,* 276 N.W.2d 641, 643 (Minn.1979). On the other hand, should this court supply language that the DHS purposely omitted or inadvertently overlooked? We think not. *See, e.g., Usery v. Kennecott Copper Corp.,* 577 F.2d 1113, 1119 (10th Cir.1977) (a regulation cannot be construed to mean what an agency intended, but did not adequately express); *Wallace v. Commissioner of Taxation,* 289 Minn. 220, 230, 184 N.W.2d 588, 594 (1971) (commissioner could not supply provision which the legislature purposely omitted or inadvertently overlooked).

In summation, we hold that the commissioner's interpretation of the terms "common operation," "common ownership" and the shared services and Medicare filing requirement language was improper because it was unreasonable under the circumstances. It is not the present rule or the methods used to interpret it which disturbs us. Rather, it is the fact that the DHS granted relators hospital-attached status under the 1980 rule, but upon promulgation of an amended, yet similar, rule in 1985, revoked this status without apparent justification under the terms of the rule.

## II.

A "rule" is defined as "every agency statement of general applicability and future effect, including amendments, suspensions, and repeals of rules, adopted to implement or make specific the law enforced or administered by it or to govern its organization or procedure." Minn.Stat. § 14.02, subd. 4 (1988). This court recognizes three types of agency rules: legislative, interpretative and procedural. *McKee v. Likins,* 261 N.W.2d 566, 577 (Minn.1977). "Interpretative rules" are defined as those rules which are promulgated to make specific the law enforced or administered by the agency. *Minnesota–Dakotas Retail Hardware Ass'n v. State,* 279 N.W.2d 360, 364 (Minn.1979). The commissioner's definitions here are interpretative rules because they make the rule in issue more specific. *See id.* at 365. All rules, including interpretative rules, must be adopted in accordance with the Minnesota Administrative Procedure Act. *See* Minn.Stat. § 14.45

---

2. This issue pertains only to relators St. Otto's and St. Francis because the commissioner did not raise it with regard to Luther Haven.

3. The ALJ stated that this language was ambiguous because all facilities, including free-standing homes, must use the step-down method of allocation. This appears to be a case of poor drafting rather than ambiguity and should not allow the DHS to read a combined cost report requirement into the rule.

(1988); *White Bear Lake Care Center v. Minnesota Dep't of Pub. Welfare*, 319 N.W.2d 7, 8–9 (Minn.1982). Failure to follow the procedures of the Minnesota Administrative Procedure Act invalidates the rule. *White Bear Lake Care Center*, 319 N.W.2d at 9.

■ The commissioner's definition of the term "common ownership" did not create a new rule because it was consistent with the plain meaning of the rule. As mentioned previously, however, the commissioner's interpretation of "common ownership" was unreasonable under the circumstances and, therefore, improper. Conversely, the commissioner's definition of the Medicare filing requirement language is clearly inconsistent with the plain meaning of the rule. The commissioner sought to add the additional requirement that the nursing home be included in the attached hospital's cost reports. Such a requirement is not evidenced by any language in the rule. Thus, the commissioner's definition of the Medicare filing requirement language constituted a new rule.

The commissioner's definition of the shared services language also appears to be inconsistent with the plain meaning of the rule. Although the ALJ held that shared services meant substantial sharing of services, arguably consistent with the plain meaning of the rule, he based his decision on the fact that none of the nursing homes were included as cost centers on the combined cost reports that their hospitals filed with Medicare. While such a requirement may be supported by the purpose of the rule and the DHS's intent, it is not evident from the plain meaning of the rule and, therefore, constituted unpromulgated rulemaking.

The commissioner's definition of "common operation" presents a more difficult question. A persuasive argument can be made that the commissioner's definition, while restrictive, is not inconsistent with the plain meaning of the rule. However, we believe that it is. It is evident, notwithstanding its argument to this court, that the DHS did not intend such a restrictive definition. Interpreting "common opera-

tion" to mean total integration would thwart the purposes of the rule as advanced by the DHS. To illustrate, a nursing home could receive allocations of costs from a hospital through its combined step-down cost report, thereby incurring the higher costs which the rule seeks to compensate. If the nursing home and the hospital had less than total integration of their operations, however, hospital-attached status would be denied.

Based on the above analysis, we hold that the commissioner's definitions of the term "common operation" and the language of the shared services and Medicare filing requirements constituted improperly promulgated rules while its definition of "common ownership" did not. We must now decide the effect of the commissioner's improper rulemaking.

We normally invalidate an agency's action when the agency fails to follow proper rulemaking procedures. *Id.* Respondent cites *In re Peoples Natural Gas Co.*, 389 N.W.2d 903 (Minn.1986), for the proposition that the improper promulgation of a rule does not render a correct interpretation of that rule incorrect. Notwithstanding the fact that we have held the DHS's interpretation of Minn.R. 9549.0020, subp. 26 (Supp.1986) incorrect, *Peoples Natural Gas* is distinguishable. That case involved a Minnesota Public Utilities Commission statement of policy issued to the public, but not promulgated as a rule under the Minnesota Administrative Procedures Act. In response to petitioner's claim that the policy statement was invalid as an improperly promulgated rule, the court stated:

> The issue, however, is not whether MPUC followed proper rulemaking procedures in issuing its policy statement but whether it correctly interpreted and applied the statutory provisions in this case. That MPUC may have articulated its construction of a statute in a rule improperly promulgated does not render a correct interpretation incorrect. *Cf. Cable Communications Bd. v. Nor-West Cable*, 356 N.W.2d 658, 667 (Minn. 1984). While slavish adherence to a defective rule might well prove trouble-

some, MPUC recognizes that, unlike a properly promulgated rule, its policy statement does not have the force and effect of law. The statement expressly notes that in each case the policy set out in the statement will merely provide the starting point for deliberation, "but the final decision will depend upon the facts of the case."

*Id.* at 906.

*Peoples Natural Gas* should not be read to stand for the principle that if the agency's interpretation of a statute or rule is correct, it is irrelevant that the rule was improperly promulgated. There, the Minnesota Public Utilities Commission recognized that its policy statement did not have the effect of law and that it provided only a starting point for deliberation. *Id.* Conversely, in the present case, the DHS's action had the effect of law because it created new mandatory requirements. Additionally, and perhaps most importantly, the policy statement in *Peoples Natural Gas* was issued at least a year before any of the action and all parties were aware of its contents. In the present case, there was no express warning or notice of the agency's intention to interpret the rule more restrictively or add a combined cost report requirement. The only indication St. Otto's and St. Francis had that hospital-attached status would not be granted was the DHS's denial of hospital-attached status for the rate year beginning July 1, 1984. This denial was subsequently withdrawn when the DHS realized that it was statutorily required to group all C&NC units together for rate-setting purposes for the rate years beginning July 1, 1983 and July 1, 1984. The record does not reflect whether the DHS revealed to the homes the reason they were denied hospital-attached status.

Luther Haven's attorney was present at the rulemaking proceedings for the new definition of hospital-attached status and did express his belief that the new rule would adversely affect his client. While this may indicate that Luther Haven had some notice of the DHS's intention, we do not believe it should be held to the fears of its attorney. This is because the language of the rule did not change substantially after 1985; only the DHS's interpretation of this language changed.

### III.

■ The record shows that, in the contested case hearings of both nursing homes, the ALJ and the commissioner considered the results of a DHS commissioned study that was not expressly introduced into evidence. The court of appeals held that the ALJ properly considered the study as part of the rulemaking history of Minn. R. 9549. *St. Otto's Home*, 425 N.W.2d at 259; *see also In re Handle With Care v. Dep't of Human Serv.*, 406 N.W.2d 518, 522 (Minn.1987). On appeal, relators argue that the ALJ improperly considered the study because (a) it relied on a hearsay characterization of the study and (b) the study was initially discussed in a 1987 proceeding; therefore, it cannot be considered part of the rulemaking history of a rule promulgated in 1985.

It is unnecessary to reach the merits of relators' claims because an examination of the study reveals that any error the court may have made by considering it is harmless and non-prejudicial. The study, as quoted by the ALJ in approving the need and reasonableness of the 1987 permanent rule, provided:

> The Department decided to group C&NCs separately on the advice of its consultant * * *. The consultant determined that since 99 percent of the C&NCs in the state were over the 60th percentile for other operating costs, they should be grouped separately to avoid the negative financial impact arraying them with other free-standing facilities would have. The Department's policy decision regarding the treatment of other operating costs of C&NC units establishes the need and reasonableness of the proposed rule. The Department may treat nursing homes differently when there is a rational basis for doing so. It may consider the fiscal impact of alternative classifications and its general goal for a neutral budget impact in grouping

nursing homes for purposes of establishing cost limits. * * *

As relators recognize in their briefs, the statement of this study is the basic principle that hospital-attached facilities have higher other operating costs than free-standing facilities. Relators can hardly dispute this as it is the basis of their claim for higher reimbursement rates. They do not disagree with the ALJ's conclusion that hospital-attached facilities have higher rates, but, rather, the rationale used to reach that conclusion. The study in question only explains the reasons. Furthermore, there is no evidence that the ALJ relied on this study to conclude that "combined cost reports" were required. It was included in the ALJ's memo at the end of the factual summary of the rule's history, but not in any of the ALJ's reasoning.

## IV.

Because of our analysis above, we do not need to decide whether the commissioner's denial of hospital-attached status denies relators equal protection of the law.

Because we hold that the commissioner's interpretation of Minn.R. 9549.0020, subp. 26 (Supp.1986) was improper and constituted unpromulgated rulemaking at variance with the Administrative Procedures Act, we reverse the commissioner and the court of appeals and hold that the three homes in question must, for purposes of reimbursement, be treated in the same manner as in 1980–1985. It appears to us that, when the DHS intends to change substantially its interpretation of a rule under which relators have received significant benefits for 4 years, it must outline these changes in clear terms in rules properly promulgated under the Minnesota Administrative Procedures Act. To hold otherwise would mean that these homes could rely on the agency application and expend money for operations only to have the rug quickly pulled from under them by a new interpretation of that rule.

Reversed and remanded to the commissioner for reimbursement.

SIMONETT, J., took no part in the consideration or decision of this matter.