**In the Matter of the RATE APPEAL OF BENEDICTINE HEALTH CENTER.**

**No. A05–873.**

Supreme Court of Minnesota.

March 15, 2007.

Samuel D. Orbovich, Thomas L. Skorczeski, Orbovich & Gartner Chartered, St. Paul, for appellant.

Lori Swanson, Atty. Gen., Erika Schneller Sullivan, Asst. Atty. Gen., St. Paul, for respondent.

Stephen Knud Warch, Halleland Lewis Nilan & Johnson, P.A, Minneapolis, for amicus group Care Providers of MN.

## OPINION

HANSON, Justice.

Appellant Benedictine Health Center (Benedictine), a nursing facility, challenges the rate established by respondent Department of Human Services (DHS) for medical assistance reimbursement for the reporting years ending September 30, 1994 and 1995. Specifically, Benedictine objects to the disallowance of the amount by which its payments to a self-insured employee health benefit plan (the Plan) exceed the liabilities incurred by the Plan for medical claims made during each reporting period.[1] Benedictine argues that the payments are akin to premiums paid for commercial health insurance, which are allowable costs and are incurred in the reporting period when they are paid, but DHS argues that the payments are akin to an internal reserve for future health claims, the costs of which are incurred only in the reporting period when the health claims are submitted. The dispute turns on whether the payments were made to an "unrelated or-

1. Although the parties consistently refer to the DHS allowance as being based on the claims "paid out of the plan," at oral argument they confirmed that DHS did allow costs associated with claims that had been submitted but not yet paid as of the end of each reporting year.

ganization," which makes them akin to premiums, or to a "related organization," which makes them akin to reserve funds. The commissioner of DHS granted DHS's motion for summary disposition and the court of appeals affirmed. *In re Rate Appeal of Benedictine Health Ctr.*, No. A05–873, 2006 WL 224289, at *4 (Minn. App. January 31, 2006). We reverse.

Benedictine is a nursing facility located in Duluth, Minnesota. It is a member of Benedictine Health System (BHS). As a vendor of medical assistance services within the State of Minnesota, Benedictine is reimbursed by DHS for services it provides to medical assistance recipients.[2] During the time period relevant to this appeal, DHS reimbursed Benedictine at a rate calculated pursuant to Minn.Stat. §§ 256B.41–.50 (2006) and the rules that DHS promulgated thereunder, Minn. R. 9549.0010–.0080 (2005) (collectively known as "Rule 50").

*The Rule 50 Rate–Setting Process*

Under Rule 50, DHS sets prospective reimbursement rates for each nursing facility based partly on that facility's actual allowable historical operating costs. Minn. R. 9549.0056, subp. 5. DHS calculates each facility's reimbursement rate for the "rate year" that begins on July 1, using a formula that includes the "actual allowable historical operating costs" that the facility "incurred" during the previous "reporting year." Minn. R. 9549.0054, subp. 1. To be allowable under Rule 50, an operating cost must be (1) "ordinary, necessary, and related to resident care"; (2) "what a prudent and cost conscious business person would pay * * * in the open market in an

arm's length transaction"; and (3) "for goods and services actually provided in the nursing facility." Minn. R. 9549.0035, subp. 8(A–C).

Costs incurred to provide employee group health insurance are specifically made allowable under Rule 50. Minn. R. 9549.0035, subp. 4(A)(1); Minn. R. 9549.0020, subp. 23. And Rule 50 does not distinguish between costs incurred to provide commercial group health insurance and costs incurred to provide self-insured group health benefits. But, since 1989, DHS has followed two internal policies concerning self-insured health benefits: (1) the "cost of providing the self insurance must not exceed the cost of an insurance program arrived at through reasonable procurement procedures, such as competitive bids" (not-to-exceed-premiums policy); and (2) the allowable costs of self insurance are limited to the "claims paid and administrative costs associated with managing [it]" (not-to-exceed-claims-paid policy).

Benedictine takes issue with the not-to-exceed-claims-paid policy and focuses its objection on an internal policy memorandum issued by DHS to its rate-setting staff on March 4, 1992 (1992 Memorandum). The 1992 Memorandum states that the "costs allowable for facilities that are self insuring" are "[a]ctual claims paid during the reporting year."

*Benedictine's Self–Insurance Plan*

Because the commissioner granted DHS's motion for summary disposition, the commissioner was required to view the evidence describing the self-insurance plan in the light most favorable to Benedictine.[3]

---

**2.** Benedictine has chosen to receive public reimbursement as a participant in the Title XIX Medical Assistance Program. *See* 42 U.S.C. § 1396a(a)(13) (2000); Minn.Stat. §§ 256B.41–.50 (2006).

**3.** *See* Minn. R. 1400.5500(K) (2005) (authorizing summary disposition "where there is no genuine issue as to any material fact"); Minn. R. 1400.6600 (2005) (stating that in the absence of contrary administrative rules, the Minnesota Rules of Civil Procedure apply to

Benedictine's affidavits incorporate its answers to DHS's interrogatories, which describe how the Plan was organized and operated.

Benedictine began self-insuring on January 1, 1994. BHS established the Plan for the use of Benedictine and other affiliated organizations, but BHS did not administer the Plan. Instead, BHS contracted with an independent third-party administrator, CC Systems Corporation (CCS), to perform duties related to Plan administration. Among other things, CCS processed employees' claims and made disbursements from a designated account to pay claims, administrative fees, and stop-loss insurance premiums.

BHS established the designated account (Plan Account) to receive member payments and to be used by CCS to pay health claims. Signers on the Plan Account included BHS employees and CCS employees, but not Benedictine employees. BHS delegated control of the disbursement of funds from the Plan Account to CCS and CCS held all the checks for the Plan Account. As relevant here, the only use of the Plan Account funds in 1994 and 1995 was to pay providers for medical services or drugs delivered to eligible employees and to pay the administrative charges of CCS.[4] No amounts from the Plan Account were paid to BHS for its role in establishing or maintaining the Plan or the Plan Account.[5]

BHS adopted written policies that restricted the use of the Plan Account in the following respects. The funds in the Plan Account were not available, either to Benedictine or BHS, for purposes other than those of the Plan. They were deposited into a separate account set up specifically for the Plan. The Plan Account was interest-bearing, but was not otherwise invested, due to the short-term nature of the need to use the funds to pay claims. Any excess in the Plan Account over actual claims paid remained in the Plan Account and could be used to adjust monthly payments in the following year. Any participating organization, such as Benedictine, could leave the Plan and, in such case, would have 18 months to settle up on its claims activity.[6]

Independent actuaries were used to recommend the amount of the monthly payments that Benedictine was to make to the Plan Account. For 1994, the monthly payments were determined by CCS based on the recommendations of The Wyatt Company (Wyatt), consulting actuaries. Wyatt examined Benedictine's historical claim experience and produced a worksheet for Benedictine specifying the amount of each

---

the extent that they "promote a fair and expeditious proceeding"); *Sauter v. Sauter*, 244 Minn. 482, 484, 70 N.W.2d 351, 353 (1955) ("A motion for a summary judgment may be granted pursuant to Rule 56.03 of Rules [of Civil Procedure] only if, *after taking the view of the evidence most favorable to the nonmoving party*, the movant has clearly sustained his burden of showing that there is no *genuine* issue as to any *material* fact and that he is entitled to judgment as a matter of law." (first emphasis added)).

4. Funds were also used to pay for stop-loss coverage, PAN/Effective Care, and a managed care access fee, none of which is at issue here.

5. BHS allocated central office costs to Benedictine and the other members of the system, but they were not specific to the Plan and they are not part of the funds at issue in this appeal.

6. Although Benedictine provided a narrative discussion of the Plan and the corporate policies of BHS, it did not place the Plan document or the written policies in the record. DHS received copies of the Plan document and relevant policies in discovery and did not, for purposes of the motions for summary disposition, challenge Benedictine's description of them.

required monthly payment. For 1995, Wyatt used the same claims data as for 1994, but a second employee benefit consultant, Mammel & Associates, Inc. (Mammel) was asked to verify the funding levels. The 1995 monthly payments were based on the average of the Wyatt and Mammel recommendations for Benedictine. Benedictine paid that specified amount monthly to the Plan Account and recorded the payments as "fringe benefit" expenses, a category of allowable costs.

Finally, BHS's contract with CCS provided that the self-insurance plan would produce savings compared to the premiums that would otherwise be paid to a commercial insurer. It recited that the utilization by CCS of the Physician AWARE and Inpatient Hospital AWARE Programs of Blue Cross and Blue Shield of Minnesota would reduce physician's charges. In this connection, DHS does not contend that the payments by Benedictine to the Plan Account were greater than the payments that Benedictine would have been required to make as premiums to a commercial insurer if it was not self-insured. If the payments had been excessive, DHS would have been authorized to disallow the excess as not being "ordinary," "necessary," or "what a prudent and cost conscious business person would pay." Minn. R. 9549.0035, subp. 8(A) and (B).

*Procedural History*

DHS audited Benedictine's 1994 and 1995 cost reports. As relevant here, DHS allowed costs for administrative fees and claims paid from the Plan Account, but disallowed the excess over those amounts of Benedictine's payments into the Plan Account. After receiving DHS's final appeal determination, Benedictine requested a contested case hearing. The matter came before an administrative law judge (ALJ) on cross-motions for summary disposition.

In its motion, Benedictine argued that the plain language of Rule 50 allows costs for group health insurance and makes no distinction between premiums paid to a commercial insurer and payments made to a self-insured plan account. In its motion, DHS characterized Benedictine's payments into the Plan Account as "funds set aside in a related [organization's] account for estimated future health insurance claims."

The ALJ recommended that the commissioner deny Benedictine's motion for summary disposition and grant DHS's motion. The ALJ characterized Benedictine's payments to the Plan Account as "monies [placed] into an account for the payment of future claims" and found that DHS's policy of denying reimbursement for those payments was consistent with "Rule 50's definition of historical operating costs as those costs actually incurred." The ALJ recommended a total disallowance of $168,037.44 for the two rate years. The commissioner adopted the ALJ's recommendation.

Benedictine appealed to the court of appeals, raising the same arguments made before the ALJ and Commissioner, but adding the further argument that any difference in treatment by DHS of the costs of self-insurance from the costs of insurance premiums would violate the Equal Protection Clause of the United States Constitution. The court of appeals affirmed the commissioner. *Benedictine Health Ctr.*, 2006 WL 224289, at *6. The court concluded that the disallowance resulted from DHS's application of Rule 50's plain language, not from an unpromulgated rule. Id. at *4. The court also concluded that DHS did not violate Benedictine's right to equal protection because Benedictine is not similarly situated with facilities that pay premiums to commercial insurers. *Id.*

Benedictine petitioned for our review of the following issues: (1) whether the commissioner erred by concluding that DHS properly disallowed Benedictine's payments into a self-insurance plan; and, if not, (2) whether the disallowance of such payments violates Benedictine's right to equal protection.

## I.

■ We first consider Benedictine's argument that DHS improperly interpreted Rule 50 to disallow Benedictine's payments to the Plan Account. The meaning of words in a regulation is a question of law we review de novo. *St. Otto's Home v. Minnesota Dept. of Human Services,* 437 N.W.2d 35, 39–40 (Minn.1989). If the plain meaning of the regulation is clear, we will use our own judgment and give no deference to the agency interpretation. *Id.* at 40. If the regulation is ambiguous, we will uphold the agency interpretation if it is reasonable. *Id.*

Benedictine argues that DHS placed undue emphasis on the definition of actual allowable historical operating costs as "costs incurred" under Minn. R. 9549.0020, subp. 25, thereby disregarding the Rule 50 provision that plainly identifies group health insurance costs as allowable. *See* Minn. R. 9549.0035, subp. 4, (A)(1) (allowing "fringe benefits" for employees); Minn. R. 9549.0020, subp. 23 (defining "fringe benefits" to include "group health or dental insurance"). DHS counters that Rule 50's definition of actual allowable historical operating costs supersedes the provisions allowing group health insurance costs as a general category, because costs in every allowable category are subject to the overarching requirement that they be actually incurred during the reporting year. More specifically, DHS argues that Benedictine's payments to the Plan Account are essentially a purchase of services

from BHS, a related organization, and are only allowable at the cost incurred by BHS under the "related organization" regulations that are contained in Rule 50. Minn. R. 9549.0035, subp. 7.

■ We conclude that the arguments of both parties fall somewhat short of the mark. On the one hand, we disagree with Benedictine's argument that Rule 50's classification of self-insured health costs as an allowable cost ends the inquiry. We agree, instead, with DHS's argument that all otherwise allowable costs are subject to the requirement that they be costs actually "incurred." We note that Minn. R. 9549.0035, subp. 4, which establishes the allowability of compensation costs—including fringe benefits such as group health insurance—expressly states that the allowance of such costs is "subject to the requirements of parts 9549.0010 to 9549.0080 [Rule 50 as a whole]."

But we question DHS's argument that Benedictine's payments to the Plan Account cannot be an "incurred" cost and must necessarily be treated as a payment to a reserve account for future claims, with allowable costs "incurred" only when payments are made from the reserve fund to cover employee claims. We conclude that the pivotal question is whether the self-insurance services that Benedictine receives from the Plan and the Plan Account are furnished by BHS, as a related organization, or by CCS, as an unrelated organization. More precisely stated, the procedural question presented is whether the evidence, when viewed in the light most favorable to Benedictine, is sufficient to support Benedictine's claim that the self-insurance services are furnished by CCS, and thus that the payments to the Plan Account are akin to the payments of premiums to a commercial insurer and are incurred in the period when they are assessed and paid.

The court of appeals did not address this question, but focused instead on the definition of "incurred" under Rule 50. Rule 50 does not define "incurred," but the meaning is suggested by the mandate set forth in Minn. R. 9549.0041, subp. 6 that "[t]he accrual method of accounting in accordance with generally accepted accounting principles is the only method acceptable for purposes of satisfying reporting requirements." Under the accrual method, costs are incurred "when the liability arises, rather than when the * * * expense is * * * disbursed." *Black's Law Dictionary* 21 (8th ed.2004).[7] Given this definition, we must then ask to which transaction should it be applied: to the "liability" of Benedictine to the Plan Account for the monthly payments or to the "liability" of the Plan Account to employees for health claims? For the reasons discussed below, we conclude that the answer to that question depends on the interpretation to be given to Rule 50's "related organization" rule.

## II.

DHS's related organization rule states that a cost that is attributable to a service that is "furnished to the nursing facility by any related organization" is allowable only "at the cost incurred by the related organization for the provision of services * * *." Minn. R. 9549.0035, subp. 7. Related or-

ganizations include corporate affiliates of the facility. Minn. R. 9549.0020, subp. 38.[8]

This brings us back to the not-to-exceed-claims-paid policy contained in the DHS 1992 Memorandum—that the costs allowed for self-insurance are only the "[a]ctual claims paid during the reporting year." The 1992 Memorandum does not explain the rationale for this policy or support it by reference to any language in Rule 50, or in Minn.Stat. § 256.431 (2006), the enabling legislation for Rule 50. And the DHS "Procedures Manual for Rate Setting of Nursing Homes," as published in 1992 and 1995, repeats the not-to-exceed-claims-paid policy, but provides the following "Disclaimer":

> This was created by an employee of the Audit Division. Its sole purpose is to serve as a guideline and reference of the general procedures involved in rate setting. It is not to be mistaken as a summary of Department policy, rule-making, or State Statutes. It does not have the force or effect of laws or rules and should not be relied on as a citation to support adjustments made to an Annual Report of Long–Term Health Care Facilities.

More important, in practice, DHS has recognized that the not-to-exceed-claims-paid policy is based on Rule 50's related organization rule and only applies where the self-insurance services are provided to

---

**7.** This is consistent with the definitions cited by the court of appeals, quoting respectively *Black's Law Dictionary* and the *American Heritage Dictionary*—the word "incurred" means the point when one " 'suffer[s] or bring[s] on oneself' a liability or expense" or " 'become[s] liable or subject to as a result of one's actions.' " *Benedictine Health Ctr.*, 2006 WL 224289, at *3.

**8.** Minn. R. 9549.0020, subp. 38, in relevant part, defines a related organization as "an affiliate of a nursing facility." An affiliate is "a person that directly, or indirectly, through

one or more intermediaries, controls, or is controlled by, or is under common control with another person." Id., subp. 38(A). A person is "an individual, a corporation, a partnership, an association, a trust, an unincorporated organization, or a government or political subdivision." Id., subp. 38(B). Control is "the possession, direct or indirect, of the power to direct or cause the direction of the management, operations, or policies of a person, whether through the ownership of voting securities, by contract, or otherwise." Id., subp. 38(D).

a facility by a related organization. In the written appeal determination submitted to Benedictine, DHS acknowledged that "amounts paid into a fund reserve are allowable if, among other conditions, the fund is controlled and administered by an unrelated party." Similarly, at oral argument before us, DHS confirmed that one key to its disallowance here was the conclusion that Benedictine's payments to the Plan Account were "a related party transaction. If there was a payment to an unrelated third party, there would be an argument that [the payment] would be more akin to the payment of a premium to cover * * * future liabilities."

We agree that the validity of DHS's disallowance turns on whether Benedictine's payments to the Plan Account were related party transactions. We further agree that DHS correctly interpreted the related organization rule when it said that "amounts paid into a [self-insurance] fund reserve are allowable if, among other conditions, the fund is controlled and administered by an unrelated party." Our disagreement with DHS is on the question of whether the evidence, when viewed in the light most favorable to Benedictine, is sufficient to support Benedictine's claim that the Plan and Plan Account were "controlled and administered" by CCS, an unrelated party. We conclude that Benedictine has provided sufficient evidence to support its claim, and that summary disposition was therefore inappropriate.

According to Benedictine's evidence, the Plan and Plan Account are controlled and administered by CCS, with the assistance of Wyatt and Mammel. Benedictine's evidence shows that the payments it made to the Plan Account have the essential characteristics of premiums. The actuarial studies that were used to set the amount that Benedictine was required to pay monthly into the Plan Account were conducted by unrelated parties over whom Benedictine had no control. The actuarial studies were designed to predict the claims that the Plan Account would actually incur in the reporting year, not in some future year.[9] Once Benedictine made the payment to the Plan Account, it lost control of the funds. And, by BHS's agreement with CCS and BHS corporate policies, the funds could only be used by CCS to pay health claims and administrative costs.

There is no question that Benedictine is "related" to BHS. But Benedictine's evidence suggests that BHS did not "control or administer" the Plan or the Plan Account. Instead, BHS structured the Plan and the Plan Account in such a way as to place them under the control of CCS as administrator, with the assistance of Wyatt and Mammel as actuaries. From the standpoint of any "purchase" of services by Benedictine, the only payments for administrative services that were made from the Plan Account were made to CCS. Benedictine's payments to the Plan Account were not used to pay any fees to BHS. BHS may have possessed some inchoate power to access the Plan Account for other purposes, but it did not in fact do so, and instead it adopted formal policies to prevent itself from doing so. Thus, while it could be said that Benedictine purchased self-insured health benefits "through"

---

9. There is no evidence that the actuaries included any additional amount as a reserve for claims to be made in future years. The fact that the estimates overstated the claim liability for a given year does not convert Benedictine's payments from a current liability to a contingent liability for future or unpaid claims. Although such an overstatement might be used to reduce Benedictine's future liabilities, adjustments to future actuarial estimates did not reduce Benedictine's current liability to make payments according to the actuarial estimates.

BHS, the evidence supports the conclusion that the services were "furnished" by CCS, within the meaning of the related organization rules.

If the Plan Account had been either an irrevocable trust or an ERISA entity, we would conclude that Benedictine unquestionably incurred a liability for each payment made into the Plan Account. Benedictine would be prohibited by law from accessing Plan Account funds for any purpose other than providing group health insurance, and to the extent that payment amounts were determined by third-party actuaries, Benedictine could prove that it did not inflate its reimbursable costs for medical assistance. *See* Restatement (Second) of Trusts § 170(1) and cmt. l (1959) ("The trustee violates his duty to the beneficiary * * * where he uses the trust property for his own purposes."); 29 U.S.C. § 1104(a)(1)(A) (2000) (requiring ERISA fiduciaries to discharge their plan-related duties for the "exclusive purpose" of "providing benefits to participants" and "defraying reasonable expenses of administering the plan"). Although the Plan Account was not governed by the law of irrevocable trusts or ERISA,[10] the results are the same, when we view the evidence in the light most favorable to Benedictine, because we would conclude that the Plan and the Plan Account were sufficiently "controlled and administered" by CCS to preclude the application of Rule 50's "related organization" rule.

In this connection, we do not share the concern expressed by the court of appeals, that Benedictine's interpretation "would allow a nursing facility to set aside any amount for future medical claims and as-sert that it has incurred the costs,"[11] because the Plan and Plan Account were structured to avoid such manipulation and because DHS had full authority to prevent such an abuse. Under the Plan, Benedictine did not determine the amount to be paid monthly, but instead, committed itself to pay the amount specified on the basis of actuarial studies. There is no evidence that Benedictine interfered with those studies or that the estimates that resulted from them were not reasonable. Moreover, DHS had full auditing authority to disallow payments in excess of those considered to be ordinary, necessary, or prudent, based on comparisons to commercial insurance rates. DHS does not claim that any of the amounts established for Benedictine's monthly payments were unreasonable.

█ We hold that, under the plain meaning of Rule 50's related party rules, the payments made by a nursing facility to a self-insured group health plan account that is controlled and administered by an unrelated organization, based on actuarial estimates of health claims that are expected to be made against the plan in the reporting year, are part of the facility's "actual allowable historical operating costs" and are "incurred" in the reporting year in which they are assessed and paid.

### III.

█ We further hold that, to the extent it purports to apply to self-insurance plans controlled and administered by an unrelated organization, the not-to-exceed-claims-paid policy contained in DHS's 1992 Memorandum constitutes unpromulgated rulemaking in violation of the Minnesota Ad-

---

10. Benedictine's Plan is a "church plan" under 29 U.S.C. § 1002(33)(A) (2000) and is therefore expressly exempted from ERISA requirements under 29 U.S.C. § 1003(b)(2) (2000).

11. *Benedictine Health Ctr.,* 2006 WL 224289, at *3.

ministrative Procedure Act, Minn.Stat. ch. 14 (2006). A "rule" is defined in the Act as

> every agency statement of general applicability and future effect * * * adopted to implement or make specific the law enforced or administered by that agency or to govern its organization or procedure.

Minn.Stat. § 14.02, subd. 4 (2006). When adopting a rule, an agency must follow the procedures set forth in the Act. Minn.Stat. § 14.05, subd. 1 (2006). We have stated that "[a]n agency interpretation that 'make[s] specific the law enforced or administered by the agency' is an interpretive rule that is valid only if promulgated in accordance with the Act." *In re Mapleton Cmty. Home*, 391 N.W.2d 798, 801 (Minn.1986) (quoting *Minnesota–Dakotas Retail Hardware Ass'n v. State*, 279 N.W.2d 360, 364 (Minn.1979)).

To the extent that DHS's not-to-exceed-claims-paid policy was intended to be absolute, it does not reflect the correct interpretation of Rule 50's related organization rule. As noted, DHS itself interprets the related party rule to mean that the not-to-exceed-claims-paid policy does not apply where the self-insurance plan is "controlled and administered" by an unrelated party.

Further, we find that the not-to-exceed-claims-paid policy may contradict the other, not-to-exceed-premiums policy of DHS regarding self-insurance. DHS has stated that "the Department has no problem with self-insurance in the health and dental insurance areas so long as the program is a viable alternative to a premium based plan." This not-to-exceed-premiums policy is a reasonable interpretation of Rule 50 because it provides an incentive for a facility to reduce its health insurance costs, thereby reducing its Medical Assistance

reimbursement rate, by turning to self-insurance. That policy is not served if a facility that turns to self-insurance, and pays less to a self-insurance plan than it would pay to a commercial insurer, is penalized by not being able to receive reimbursement for the full amount it pays to the self-insurance plan, but only the amount the plan pays for claims. Under such a result, the incentive for the facility would be to simply purchase commercial insurance, at a higher overall cost, to avoid a shortfall in its reimbursement.

Because the not-to-exceed-claims-paid policy stated in the 1992 Memorandum, at least as applied here, does not reflect a proper interpretation of Rule 50's related organization rule, and is inconsistent with DHS's not-to-exceed-premiums policy, we conclude that it is an unpromulgated rule that is not entitled to deference.

We hold that the commissioner erred in granting DHS's motion for summary disposition. When the evidence is viewed in the light most favorable to Benedictine, there are genuine issues of material fact that preclude summary disposition in favor of DHS. Because we cannot determine from this record whether DHS, given our holding, would choose to dispute Benedictine's facts, we cannot conclude that it was also error to deny Benedictine's motion for summary disposition. Benedictine might argue that DHS waived the right to dispute Benedictine's facts by agreeing to the submission of cross-motions for summary disposition, but we believe the commissioner is in a better position to resolve that argument. Accordingly, we reverse the grant of DHS's motion for summary disposition and remand to the commissioner for further proceedings consistent with this opinion.[12]

Reversed.

Dissenting, ANDERSON, PAUL H., J.

12. Having concluded that the commissioner erred in granting DHS's motion for summary

ANDERSON, Paul H., Justice (dissenting).

I respectfully dissent. For the reasons set forth below, I conclude that the Department of Human Service's (DHS) "not-to-exceed-claims-paid" policy[1] as applied to Benedictine comports with the plain meaning of Rule 50. Therefore, the policy is not an interpretive rule that must be promulgated under the Minnesota Administrative Procedure Act, Minn.Stat. ch. 14 (2006) (MAPA). *See Cable Communications Bd. v. Nor–West Cable Communications P'Ship*, 356 N.W.2d 658, 667 (Minn. 1984) ("[If an] agency's interpretation of a rule corresponds with [the rule's] plain meaning * * * the agency is not deemed to have promulgated a new rule."). Further, I conclude that the record shows that Benedictine Health System (BHS) has the legal right to use funds in the plan account at its sole discretion. Because BHS has this legal right, Benedictine's payments to the plan account are essentially payments to a corporate affiliate—BHS. Accordingly, under Rule 50, Benedictine does not incur any medical insurance costs until BHS is liable to a third party for medical or other insurance-related services rendered. Therefore, unlike the majority, I would affirm the court of appeals.

*Points of Agreement*

While I reach a different conclusion from the majority as to the meaning of Rule 50 and its application to this case, I agree with several aspects of the majority's analysis. First, I agree that we review the meaning of regulatory language de novo, and when the plain meaning of a regulation is clear, we do not defer to an agency's interpretation of that regulation. *St. Otto's Home v. Minnesota Dept. of Human Services*, 437 N.W.2d 35, 39–40 (Minn.1989) (citation omitted). I also agree that only those costs which are actually "incurred" are allowable historical operating costs, and that under generally accepted accounting principles, a cost is incurred when a liability arises, rather than when an expense is disbursed. *See* Minn. R. 9549.0020, subp. 25 (2005) (defining "historical operating costs" as "costs incurred"); Minn. R. 9549.0041, subp. 6 (2005) (stating that the accrual method of accounting in accordance with generally accepted accounting principles must be used by facilities in satisfying reporting requirements); *Black's Law Dictionary* 20 (8th ed.1999) (stating that under the accrual method of accounting, costs are incurred "when the liability arises, rather than when the * * * expense is * * * disbursed").

Along with the majority, I conclude that determining when a cost is "incurred" is only one of the tasks we must complete in order to resolve the matter before us. This is so because the parties' arguments implicate Rule 50's related organization provision, Minn. R. 9549.0035, subp. 7 (2005).[2] I agree that in light of the related organization provision, the critical question

---

disposition, we do not reach Benedictine's claim that the disallowance violates its right to equal protection.

1. While the policy at issue may more accurately be termed a "not-to-exceed-claims-submitted" policy for the reason the majority states in footnote 1 of its opinion, I have adopted the majority's "not-to-exceed-claims-paid" terminology for the purposes of consistency.

2. Under Minn. R. 9549.0035, subp. 7, costs attributable to services that are directly or indirectly provided to a nursing facility by any related organization are allowable "at the cost incurred by the related organization for the provision of [those] services." It is undisputed that Benedictine and BHS are corporate affiliates and are therefore related organizations under Minn. R. 9549.0020, subp. 38 (2005).

we must answer is whether Benedictine's payments to the plan account are more properly characterized as payments to an unrelated organization—CC Systems Corporation (CCS)—or payments to a corporate affiliate—BHS. Our answer to this question is critical because when a nursing facility pays an unrelated organization for a service such as group medical insurance, the facility incurs a cost *at the time payment is made.* But when a nursing facility pays a corporate affiliate for a service, the facility incurs a cost *when and to the extent that the affiliate incurs a cost.* Finally, I agree with the majority that when answering the foregoing question, we must view the evidence in the light most favorable to Benedictine, because Benedictine appeals from a grant of summary disposition in favor of DHS.

*Points of Divergence*

I disagree with the majority on how we determine whether Benedictine's payments to the plan account are more properly characterized as payments to CCS or to BHS. I conclude that in order to make this determination, we must focus on the extent of the legal right of BHS, Benedictine's corporate affiliate, to access and use plan account funds. This focus diverges from the majority's approach, which is to ask which entity, CCS or BHS, "controls and administers" the plan and plan account. The "controls and administers" language comes from DHS, which stated in its response to Benedictine's appeal that payments into a "fund reserve" would be "allowable if, among other conditions, the fund [were] controlled and administered by an unrelated party." But "controls and administers" is an imprecise phrase that tends to obscure the relevant policy concern underlying Rule 50—that is, that reimbursement rates reflect historical operating costs that correspond to *actual liabilities.* Actual liabilities necessarily involve the accountability of one party

to another. *See Black's Law Dictionary* 925 (8th ed.1999) (defining liability as "legal responsibility to another or to society"). Therefore, the proper focus is on whether BHS, as a corporate affiliate of Benedictine, is legally accountable to a party other than itself with regard to its use of plan account funds.

If BHS has the legal right to use plan account funds at its sole discretion, it logically follows that (1) Benedictine's payments to the plan account are fairly characterized as payments to BHS; and (2) BHS suffers no liability for medical insurance costs until a medical or other insurance-related service is provided and a third party has a corresponding right to payment. Under this analytical framework, Benedictine, as a corporate affiliate of BHS, would not incur the costs of payments it makes to the plan account. Rather, Benedictine would incur the costs that correspond to the enforceable claims of third parties.

When I apply the foregoing framework to the facts of this case, I conclude that even when the evidence is viewed in the light most favorable to Benedictine, BHS has the legal right to use the plan account funds at its sole discretion. First, nothing in the contract between BHS and CCS prohibits BHS from accessing and using the plan account funds for any purpose BHS deems appropriate. Rather, the contract authorizes CCS to exercise day-to-day management of the plan account funds and to write checks from the account to pay approved claims. It is apparently true that in order to fulfill its duties under the contract, CCS holds all the checks for the plan account. But none of the foregoing facts takes away from BHS's legal right to use the plan account funds at its sole discretion, should it choose to do so. Nor does the existence of a BHS corporate

policy take away from BHS's legal right in this regard, given that under such a policy, BHS is accountable only to itself and can change its policy at will. Finally, I note that the plan account here is neither governed by ERISA nor established in conjunction with a trust, such that BHS's legal right to use the plan account funds would be subject to legally enforceable constraints.

In sum, I would hold that under the plain meaning of Rule 50 as a whole, if a corporate affiliate of a self-insuring nursing facility has the legal right to use the funds deposited in a self-insurance plan account at the affiliate's sole discretion, then (1) the nursing facility's payments to the plan account are essentially payments to its corporate affiliate; and (2) the nursing facility does not incur any allowable operating costs for group medical insurance until its corporate affiliate is itself liable to third parties for medical or other insurance-related services rendered. Accordingly, I would further hold that the Department of Human Service's policy of disallowing a nursing facility's payments into a self-insurance plan account under the facts and circumstances of this case comports with the plain meaning of Rule 50 and therefore is not an unpromulgated rule under MAPA.[3]

---

**3.** In support of its conclusion that DHS's "not-to-exceed-claims-paid" policy as applied to Benedictine contravenes the plain meaning of Rule 50, the majority notes that this policy may contradict DHS's "not-to-exceed-premiums" policy regarding self-insurance. I do not see any contradiction between DHS's not-to-exceed-claims-paid policy as applied in cases such as this one, and DHS's not-to-exceed-premiums policy. A facility that wishes to reduce its health insurance costs by self-insuring is free to do so *and to be reimbursed by DHS for the facility's payments to a plan account*—provided the facility establishes its plan and plan account appropriately. Specifically, DHS's policies are easily reconcilable as long as the funds in a self-insurance plan account are subject to legally enforceable constraints on the rights of the facility and any related organization(s) to use the funds at their sole discretion.